UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DAVID LONGORIA, INDIVIDUALLY | § | |
| AND ON BEHALF OF THE ESTATE OF | § | |
| DAVID JOHNSON, DECEASED, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| V. | § | CIVIL ACTION**** |
| | § | |
| NUECES COUNTY, TEXAS, | § | |
| JAVIER ZAPATA, JR., in his individual | § | |
| capacity; | § | |
| WILLIAM FIELDER, | § | |
| in his individual capacity; | § | |
| RICHARD CULP, in his individual capacity; | § | |
| JOHN CHRIS HOOPER, NUECES | § | |
| COUNTY SHERIFF, in his individual capacity; | § | |
| WELLPATH LLC, formerly known as | § | |
| CORRECT CARE SOLUTIONS, LLC; | § | |
| TERA PEELER, in her individual capacity; | § | |
| EDRA BOCANEGRA, in her individual | § | |
| capacity; RANDEE ROBERSON, | § | |
| in her individual capacity; and | § | |
| STACEY DAWN FLINT, | § | |
| in her individual capacity, | § | |
| | § | |
| Defendants. | § | JURY TRIAL REQUESTED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff, David Longoria, Individually and on behalf of the Estate of

David Johnson, Deceased, by and through counsel, and in support of his claims against the

above-named Defendants, Nueces County, Texas; Javier Zapata, Jr., in his individual

capacity; William Fielder, in his individual capacity; Richard Culp, in his individual

1

capacity; John Chris Hooper, Nueces County Sheriff, in his individual capacity; Wellpath LLC, formerly known as Correct Care Solutions, LLC; Tera Peeler, in her individual capacity; Edra Bocanegra, in her individual capacity; Randee Roberson, in her individual capacity; and Stacey Dawn Flint, in her individual capacity respectfully states:

## I. NATURE OF THE ACTION

1. This case presents serious, disturbing, malicious, sadistic, and intentional violations of Mr. Johnson's federal constitutional rights by Defendants including engaging in a cover-up. Mr. Johnson was an individual with mental health disabilities. While a pre-trial detainee at the Nueces County Jail, Mr. Johnson was subjected to impermissible punishment by correctional officers Defendants Zapata,[1] Fielder and Culp, namely assault causing serious bodily injury; without his consent, being photographed in the bathroom and/or changing room of the Nueces County Jail; and having his privacy invaded without his consent by having his genitals and/or pubic area and/or anus and/or buttocks photographed; and having inadequate medical care. Defendants Zapata, Fielder and Culp made false statements concerning the facts surrounding the investigation of the custodial death of Mr. Johnson. These constitutional violations resulted in Mr. Johnson's death. Mr. Johnson did nothing to invite or cause his injuries and death.

2. Despite having a well-known and developed medical record and history of mental illness, Mr. Johnson was housed in general population of the jail. Both Nueces County,

---

[1] Defendant Javier Zapata, Jr. had engaged in at least two prior incidents involving injury of pre-trial detainees in violation of the Fourteenth Amendment and his chain of command and Nueces County, Texas were aware of these incidents.

Texas and Wellpath, LLC were responsible for providing adequate medical care to Mr. Johnson. On the day of the assault by Defendants Zapata, Fielder and Culp, approximately 4 hours before his death, Mr. Johnson frantically and repeatedly yelled, "Help me." Instead of providing adequate medical care, Defendants Tera Peeler and Stacey Dawn Flint, who were Wellpath, LLC employees, made arrangements for a medical appointment the following day. Approximately 2 hours later, it was clear that Mr. Johnson was experiencing a medical emergency when blood was found on Mr. Johnson's head with an injury and as he tried to stand up, he fell to his knees. Instead of providing adequate medical care for Mr. Johnson, Defendant Randee Roberson, RN, who was an employee of Wellpath LLC, allowed   Mr. Johnson to be sent back to his cell. Less than 2 hours later, Mr. Johnson was found lying in a prone position on his bunk, pulseless, not breathing, with yellowish secretions covering his face, eyes and forehead and bright red blood and vomit was found on his bunk and on the floor.

3. Former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper, following established policy, practices and customs, allowed all three correctional officers, Defendants Zapata, Fielder and Culp to continue to work for Nueces County, Texas as jailers after the incident despite clear evidence that each violated Mr. Johnson's civil rights. Former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper's actions in allowing Defendants Zapata, Fielder and Culp to continue working, ratified their civil rights violations against Mr. Johnson showing that their actions were in conformity with Nueces County policy.

4.   Plaintiff brings the following claims in this lawsuit which, to the extent that the claims are factually or legally inconsistent, are pleaded alternatively pursuant to Federal Rule of Civil Procedure 8:

**Claims against Nueces County, a municipality,** by implementing policies, customs and practices which are the moving force behind violations of §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts) and violation of the Americans with Disabilities Act.

**Claims against Javier Zapata, Jr., in his individual capacity,** who was a correctional officer employed by Nueces County, Texas acting under color of state law, for violation of §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts); and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another Failure to Intervene/Bystander Liability.

**Claims against William Fielder, in his individual capacity,** who was a correctional officer employed by Nueces County, Texas acting under color of state law, for violation of for violation of §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity) ; 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement - Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts); and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another Failure to Intervene/Bystander Liability.

**Claims against Richard Culp, in his individual capacity,** who was a correctional officer employed by Nueces County, Texas acting under color of state law, for violation of for violation of §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment

(Inadequate Medical Care or Conditions of Confinement - Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care — Pretrial Detainee/Episodic Acts); and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another Failure to Intervene/Bystander Liability.

**Claims against John Chris Hooper, Nueces County Sheriff, in his individual capacity**, who was acting under color of state law, by failing to train and/or supervise the subordinates and by implementing unconstitutional policies, practices and customs that caused the constitutional violations under §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts) and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another Failure to Intervene/Bystander Liability.

**Claims against Wellpath, LLC**, who was acting under color of state law, in implementing policies, customs and practices which are the moving force behind violations of 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts) and violation of the Americans with Disabilities Act.

**Claims against Tera Peeler, in her individual capacity**, who was a Mental Health Professional employed by Wellpath, LLC, acting under color of state law, for violation of 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

**Edra Bocanegra, in her individual capacity**, who was a Mental Health Professional employed by Wellpath, LLC, acting under color of state law, for violation of 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

**Randee Roberson, in her individual capacity,** who was a RN employed by Wellpath, LLC, acting under color of state law, for violation of 42 U.S.C.

§1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

**Stacey Dawn Flint, in her individual capacity**, who was a LPN employed by Wellpath, LLC, acting under color of state law, for violation of 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

## II. <u>PARTIES</u>

5. Plaintiff, David Longoria, Individually and on behalf of the estate of David Johnson, deceased, is currently a citizen of Texas and resident of Dallas County, Texas. Mr. Longoria is the sole heir and son of David Johnson. Individuals who are within the class of people entitled to recover under Texas's wrongful death statute have standing to sue under Section(s) 1983 for their own injuries resulting from the deprivation of decedent's constitutional rights. Tex. Civ. Prac. Rem. Code Ann. Section 71.004; *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992). The statute clearly recognizes the right of the surviving children and parents of the deceased to bring an action for the benefit of all. Therefore, Mr. Longoria as the surviving son of David Johnson is within the class of people entitled to recover. As to David Johnson's estate: a) at the time of Mr. Johnson's death, he was not married; b) Mr. Johnson's estate had no debts and/or fewer than two debts; c) Mr. Johnson died intestate; d) no administration of Mr. Johnson's estate is pending; e) no administration of Mr. Johnson's estate was necessary; f) no administration was desired by any interested party in Mr. Johnson's estate; g) Mr. Johnson died without owning any real property; and h) David Longoria is the sole heir of David Johnson and the

only individual who may receive under Texas law from Mr. Johnson's estate. Therefore, David Longoria has the legal right and capacity to bring this lawsuit both on his own behalf and on behalf of the estate of David Johnson, deceased.

6. Nueces County, Texas is a county located in the State of Texas, and pursuant to Tex. Civ. Prac. & Rem. Code Ann. §17.024 (a) it may be served with process by serving its County Judge, Barbara Canales, at 901 Leopard Street, Corpus Christi, Nueces County, Texas.

7. Defendant, Javier Zapata, Jr., is sued in his individual capacity. Mr. Zapata is a citizen of Texas and resident of Nueces County, Texas and he may be served with process at: 314 Mainer Road, Robstown, Texas 78380-2103.

8. Defendant, William Fielder, is sued in his individual capacity. Mr. Fielder is a citizen of Texas and resident of Nueces County, Texas and he may be served with process at: 1027 Northcliff Drive, Portland, San Patricio County, Texas 78374

9. Defendant, Richard Culp, is sued in his individual capacity. Mr. Culp is a citizen of Texas and resident of Nueces County, Texas and he may be served with process at: 1106 Dorothy, Corpus Christi, Texas 78412-3454.

10. Defendant, John Chris Hooper, Nueces County Sheriff, is sued in his individual capacity. Sheriff Hooper is a citizen of Texas and resident of Nueces County, Texas and he may be served with process at: 901 Leopard St, Corpus Christi, TX 78401.

11. Defendant Wellpath LLC, formerly known as Correct Care Solutions, LLC, ("Wellpath") is a foreign limited liability company registered to do business and doing

7

business in Texas and it may be served with summons upon its registered agent: Corporate Creations Network, Inc., 2425 W. Loop South #200, Houston, Texas 77027.

12. Defendant, Tera Peeler, in her individual capacity. Ms. Peeler is a citizen of Texas and resident of Nueces County, Texas and he may be served with process at: 522 Parade Drive, Corpus Christi, Texas 78412-3150.

13. Defendant, Edra Bocanegra, in her individual capacity. Ms. Bocanegra is a citizen of Texas and resident of Nueces County, Texas and he may be served with process at: 3014 Saint Eustatius Way, Corpus Christi, TX 78418-4469.

14. Defendant, Randee Roberson, in her individual capacity. Ms. Roberson is a citizen of Texas and resident of Nueces County, Texas and he may be served with process at: 3206 Cedar Hollow Ct, Corpus Christi, TX 78414-3799.

15. Defendant, Stacey Dawn Flint, in her individual capacity. Ms. Flint is a citizen of Texas and resident of Nueces County, Texas and he may be served with process at: 6213 Cornell Drive, Corpus Christi, Texas 78414-3643.

### III. JURISDICTION AND VENUE

16. This Court has jurisdiction over this action by reason of 28 U.S.C. §1331 and §1343, because this action arises under 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution and the Americans with Disabilities Act as Plaintiff seeks to redress civil rights violations suffered at the hands of Defendants. Venue is proper pursuant to 28 U.S.C. §1391 because the events made the basis of this lawsuit occurred

within the geographical boundaries of the United States District Court for the Southern District of Texas, Corpus Christi, Division.

## IV. <u>FACTS RELATED TO THE INCIDENT INVOLVING DAVID JOHNSON</u>

### A. Mr. Johnson's background and disabilities

17. Mr. Johnson was a Black male with disabilities as defined by the Americans with Disabilities Act.[2] Mr. Johnson's disabilities included schizoaffective disorder, depressive type, which was his primary diagnosis and he was in treatment for his disabilities with the Behavioral Health Center of Nueces County. Schizoaffective disorder is a mental health condition that includes features of both schizophrenia and a mood disorder such as depression. Mr. Johnson experienced disordered thinking and concentration, inappropriate emotional responses, hallucinations and hearing voices, erratic speech and behavior, and difficulty with everyday tasks.[3] Mr. Johnson's schizoaffective disorder, depressive type, limited his major life activities of caring for himself, thinking, communicating and working.  Mr. Johnson was determined to be disabled by the Social Security Administration due to his mental health condition.

18. Unfortunately, Mr. Johnson has a history of arrests and incarcerations for minor offenses because of conduct caused by his disabilities. These arrests resulted in

---

[2] Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12134.
[3] According to the National Center for Biotechnology Information, U.S. National Library of Medicine, Schizoaffective disorder, depressive type….signs and symptoms of psychosis in people with schizoaffective disorder include false perceptions called hallucinations, such as hearing voices no one else can hear or experiencing visions, smells, or tactile (touch) sensations. Strongly held false beliefs (delusions) are also a characteristic feature. … People with this condition often have difficulty functioning at work and in social settings.

confinement in the Nueces County Jail.   During Mr. Johnson's previous incarcerations, Nueces County officials learned that Mr. Johnson suffered from serious mental health conditions including schizoaffective disorder. Mr. Johnson had prior suicide watch placement in jail documented in his medical records maintained by Wellpath. Therefore, the Nueces County officials and Wellpath officials were aware of Mr. Johnson's mental health, related history and that he was an individual with a disability.

### B. Mr. Johnson's arrest and incarceration at the Nueces County Jail on November 29, 2018

19. On November 29, 2018, while suffering from the effects of his mental health condition, Mr. Johnson was arrested for aggravated assault on a peace officer which is a felony. Mr. Johnson was booked by the City of Corpus Christi Detention Center at 14:15:25 on November 29, 2018 and Mr. Johnson was transferred to the Nueces County Jail at 21:00:08.

### C. Nueces County, Texas contracted with Correct Care Solutions, later known as Wellpath LLC, for health services for inmates at the Nueces County Jail

20. On December 1, 2015, the Nueces County Commissioners Court and Nueces County Judge entered into a Health Services Agreement with Correct Care Solutions (CCS) for Medical Services for Inmates at Jail Facilities and Residents at the Juvenile Center. (Nueces County, RFP No. 2993-15). In or about the end of 2018 or early 2019, CCS changed its name to Wellpath LLC and it operated under both the CCS and Wellpath name

at the time of Mr. Johnson's incarceration in the Nueces County Jail made the basis of this lawsuit.

### D. Nueces County did not follow the Sandra Bland Act

21. The Sandra Bland Act, Texas SB1849, was filed after the 2015 incident where Sandra Bland was found hanged in her cell in the Waller County Jail after being arrested during a routine traffic stop. The Act shortens the time periods for completing a mental health assessment and providing notices to the magistrate; requires law enforcement to divert persons suffering a mental health crisis or from the effects of substance abuse to treatment; it requires independent law enforcement agencies to investigate jail deaths; and it requires training. On July 24, 2017, the Texas Commission on Jail Standards (TCJS) sent communications to all sheriffs, including the Nueces County Sheriff, and jail administrators in Texas regarding the implementation of the Sandra Bland Act and the requirements for county jail compliance.

22. The Sandra Bland Act amended Texas Code of Criminal Procedure Art. 16.22. Early identification of defendant suspected of having mental illness or intellectual disability and it states in part:

> (a)(1) not later than 12 hours after the sheriff or municipal jailer having custody of a defendant for an offense punishable as a Class B misdemeanor or any higher category of offense receives credible information that may establish reasonable cause to believe that the defendant has a mental illness or is a person with an intellectual disability, the sheriff or municipal jailer shall provide written or electronic notice to the magistrate. The notice must include any information related to the sheriff's or municipal jailer's determination, such as information regarding the defendant's behavior immediately before, during, and after the defendant's arrest and, if

applicable, the results of any previous assessment of the defendant.   On a determination that there is reasonable cause to believe that the defendant has a mental illness or is a person with an intellectual disability, the magistrate, except as provided by Subdivision (2), shall order the service provider that contracts with the jail to provide mental health or intellectual and developmental disability services, the local mental health authority, the local intellectual and developmental disability authority, or another qualified mental health or intellectual and developmental disability expert to:

(A)  interview the defendant if the defendant has not previously been interviewed by a qualified mental health or intellectual and developmental disability expert on or after the date the defendant was arrested for the offense for which the defendant is in custody and otherwise collect information regarding whether the defendant has a mental illness as defined by Section 571.003, Health and Safety Code, or is a person with an intellectual disability as defined by Section 591.003, Health and Safety Code , including, if applicable, information obtained from any previous assessment of the defendant and information regarding any previously recommended treatment or service;  and

(B)  provide  to  the  magistrate  a  written report of an  interview described  by  Paragraph  (A)  and  the other information  collected under that paragraph on the form approved by the Texas Correctional Office  on  Offenders  with  Medical  or  Mental  Impairments under Section 614.0032(c) 614.0032(b), Health and Safety Code.
……………..

23. The Nueces County Jail failed to comply with the legal requirements under Texas Code of Criminal Procedure Art. 16.22. <u>Early identification of defendant suspected of having mental illness or intellectual disability</u> relevant to Mr. Johnson by failing to have him properly evaluated and by failing to provide required notices to the magistrate which denied him protections and rights under the Act.

24. Instead of housing Mr. Johnson in a separate treatment facility for mentally ill inmates, he was housed at the Nueces County Jail in a jail cell as a pretrial detainee inmate

in the regular population. The correctional officers that staff the regular jail population, including Defendants Zapata, Fielder and Culp, were not properly hired and trained to recognize and manage inmates with mental health conditions by Defendant Sheriff Hooper, and by failing to properly house and provide adequate mental health care to these inmates, the Nueces County Jail fails to protect vulnerable inmates with mental health conditions, such as Mr. Johnson, from violent acts of others towards them.   Further, Defendant Sheriff Hooper failed to provide training to Defendants Zapata, Fielder and Culp to recognize when and how adequate medical care should be administered to inmates such as Mr. Johnson.

### E. Mr. Johnson's medical records for November 29, 2018 show that he had no physical injuries; he had schizophrenia and he was to be housed in general population

25. Mr. Johnson was medically evaluated on November 29, 2018 at 2110 and that report states that Mr. Johnson did not have any physical injuries, no wounds or bleeding. The medical report also states that Mr. Johnson had not been involved in an accident or physical alteration in the past 12 hours.

26. The medical report also states that Mr. Johnson felt vulnerable and that he had been diagnosed as having schizophrenia. Despite the mental health diagnosis, the medical report also states that Mr. Johnson would be housed in general population.   The following *were not checked* as applicable on the medical report for Mr. Johnson: Medical Observational Housing; Medical Isolation; Mental Health Lockdown (if Mental Health not

on-site); Emergency Room for Evaluation/Treatment; IMMEDIATE placement on Suicide

Precautions (if Mental Health not on-site)

### F. Mr. Johnson's mental health conditions escalated starting on or about December 9, 2018 and he was placed on suicide watch

27. Mr. Johnson's medical records support that the Nueces County Jail employees

and Wellpath employees were aware of Mr. Johnson's mental health disabilities including

his diagnosis of schizophrenia and that he hears voices. Mr. Johnson experienced mental

health problems during his incarceration. For example, on or about December 9, 2018, Mr.

Johnson flooded his cell and then he complained about his cell being full of water. Also,

on or about December 9, 2018, Mr. Johnson began making suicidal statements and he was

placed on suicide watch. Mr. Johnson had prior suicide watches in the Nueces County Jail.

On December 10, 2018, Mr. Johnson's actions were delusional. For example, he stated that

he received a PR bond because he returned from court and then asked for his disability

check. Mr. Johnson yelled when speaking because he was upset because he was hungry

and asked for a sandwich he spotted on the floor. Mr. Johnson's medical records

maintained by Defendant Wellpath for December 9, 2018 state that a "consultation" is not

indicated and, although "refer to" was checked, there was nothing documented for a referral

or the type of referral. Defendant Bocanegra made this entry and signed the record. Ms.

Bocanegra is identified as a Mental Health Professional in Mr. Johnson's medical records,

but Ms. Bocanegra is neither a medical doctor nor a psychiatrist.   The following is this portion of Mr. Johnson's record:

| Plan: (check all that apply) |
| --- |

☑ *Follow up daily while on watch*
☐ *Discharge from watch, follow up within 7 days*
☐ *Property Allowed*
Consultation     ☑ *Not indicated*
Consultation with

☑ *Refer to:*      ☐ *Psychiatry* ☐ *Medical* ☐ *Special Needs* ☐ *Other*

BH218UN0000ACCEN050116

E-Signed by Edra Bocanegra, Mental Health Professional  on 12/09/2018 10:29 AM CST                    Page 4 of 4

## G. Mr. Johnson was taken off of suicide watch
### on or about December 11, 2018

28. On or about December 11, 2018, Mr. Johnson was taken off of suicide watch and returned to a regular cell in general population.   After Mr. Johnson returned to his regular cell, his behavior remained depressive, he tore up his mat and displayed other behavior related to his untreated mental health condition.

## H. Mr. Johnson refused medication

29. On December 13, 2018, Mr. Johnson refused medication and his records were documented that his medical conditions may worsen as a consequence. As a result of his mental health condition and not taking his medication, Mr. Johnson's appearance was marked as disheveled, his mood euphoric, his thought form was not coherent, but loose

association[4], and his thought content delusional. All of these acts put Nueces County Jail officials and Wellpath officials, including, but not limited to Defendants, Zapata, Fielder, Culp, Peeler, Bocanegra, Roberson, and Flint, on notice that Mr. Johnson's serious mental illness was not being treated and that he was not being provided with adequate medical care.

### I. Mr. Johnson's medical records do not support that he ever saw a physician or psychiatrist while incarcerated at the Nueces County Jail

30. Mr. Johnson's medical records from Wellpath during his incarceration made the basis of this lawsuit show that he did not see a psychiatrist or physician.

### J. Mr. Johnson did not take his morning medication on December 15, 2018

31. Defendant Flint recorded in Mr. Johnson's medical records from Wellpath that he refused his medication, Respiridone, and that he was aggressive towards staff at 9:00 a.m. on December 15, 2018. However, the medication record entry by Japeth Fernandez, LPN shows that Mr. Johnson was "out of unit" and that was the reason for his not taking his medicine on that date and time.

32. If the account by Defendant Flint is correct, there is nothing in Mr. Johnson's records that Defendant Flint took any action to treat Mr. Johnson for his mental health condition or refer him to a higher level of care for his mental health condition.

### K. On December 15, 2018, Defendants Zapata, Fielder and Culp assaulted Mr. Johnson causing him serious injury

---

[4] Loose association is also known as derailment which is spontaneous speech with marked impairments in topic maintenance. John Hopkins Psychiatry Guide, Thought Disorder

33. On December 15, 2018, while in custody at the Nueces County Jail as a pre-trial detainee inmate, Mr. Johnson was subjected to impermissible punishment, namely assault by Defendants Zapata, Fielder and Culp which caused him serious bodily injury; without his consent, being photographed in the bathroom and/or changing room of the Nueces County Jail; and having his privacy invaded without his consent by having his genitals and/or pubic area and/or anus and/or buttocks photographed.[5]

### L. At approximately noon on December 15, 2018, Mr. Johnson shook and pulled on his cell doors yelling, "Help me"

34. At approximately noon on December 15, 2018, Mr. Johnson shook and pulled on his cell doors yelling, "Help me." Clearly, Mr. Johnson needed urgent medical care and attention. Instead of providing immediate and appropriate medical care and attention to Mr. Johnson, the LPN assigned to Mr. Johnson, Defendant Flint, contacted Defendant Peeler, and Defendant Peeler advised Defendant Flint that she would see Mr. Johnson the next day. Defendant Peeler is identified as a Mental Health Professional in the Wellpath records, but she is neither a physician nor a psychiatrist. Defendant Nueces County, Texas, Wellpath, Peeler and Flint's failure to provide acute and emergency medical care to Mr. Johnson lead to his death.

### M. At approximately 2:30 pm. on December 15, 2018, Mr. Johnson was taken to the nursing unit for "blood in hair" and he was so weak that he fell to his knees

---

[5] *State of Texas v. Javier Zapata, Jr.*, Case No. 19FC-4813E, In the 148th Nueces County District Court; *State of Texas v. Fielder*, Case No. 19FC-4815E, In the 148th Nueces County District Court; *State of Texas v. Culp*, Case No. 19FC-4816E, In the 148th Nueces County District Court.

35. Mr. Johnson's health condition continued to decline, and it was clear that he was experiencing a medical emergency and needed urgent medical attention. On or before 2:44 p.m. on December 15, 2018, Mr. Johnson was escorted to the intake nursing unit for assessment for report of blood on the back of his head. Defendant Roberson, a registered nurse, watched another registered nurse employed by Wellpath place Mr. Johnson in a chair in the middle of intake with correctional officers' present. Mr. Johnson did not speak and would not make eye contact. He was handcuffed behind his back.

36. The nurse found a wound with bloody ooze on the back of Mr. Johnson's head. Other than taking his vital signs, looking at his pupils and asking Mr. Johnson to wiggle his fingers, no other assessment or treatment were performed. This was inadequate medical care.

37. After the assessment was completed, Mr. Johnson being too weak to stand, he fell to his knees after getting out of the chair. Instead of providing Mr. Johnson with adequate medical care to address his acute and emergency needs, he was brought to his feet by the correctional officers. Mr. Johnson's handcuffs were still in place. The officers took Mr. Johnson back to his cell. None of these medical events were documented at the time of the occurrence. These events were documented in Mr. Johnson's Wellpath medical records on December 16, 2018 at 9:24 a.m. by Defendant Roberson which was the morning after Mr. Johnson's death. Nueces County and Wellpath LLC maintained a policy of not having an appropriate level of medical staff on duty to handle acute and emergency medical situations; not including an on-duty jail supervisory staff with authority to transfer an

inmate to a medical facility and a policy of inadequate monitoring of pretrial detainees which amounted to a denial of medical care. Defendant Wellpath and Roberson's failure to take action to provide adequate medical care or refer Mr. Johnson for adequate medical care lead to Mr. Johnson's death.

### N. At approximately 4:15 p.m. on December 15, 2018, Mr. Johnson was found prone on his bunk with blood and vomit around his head and on the floor and bed, unresponsive, pulseless, and not breathing

38.   At approximately 4:15 p.m. on December 15, 2018, Jean Knutson, LPN who is a Wellpath employee, found a unit officer standing at Mr. Johnson's cell door while Mr. Johnson was prone on his bunk with blood around his head area, unresponsive, pulseless and not breathing. There was blood and vomit on the floor, including the cell entrance, and on Mr. Johnson's bunk.

39. On December 15, 2018 at 6:01 p.m., Nurse Cynthia Ann Morgan, a Wellpath employee, wrote in Mr. Johnson's medical records:

Emergency response cell location called by custody staff.

Upon arrival cell side/bedside CPR in progress and EMS was called to the facility.

CPR held. Assessment performed.

Pulseless, nonbreathing, skin cold to touch. Bruising with possible scrape for forehead however unable to assess secondary to yellowish covering face/eyes/forehead. bright red blood noted on the bunk, bright red blood noted on the floor. Unable to locate wound or source of bleeding, no obvious blood notes in the mouth or eyes. AED applied and CPR resumed with AED prompts followed, PR maintained with 3 supervised medical staff rotations maintaining quality and timely compressions.   During CPR copious oral secretions noted 02 with bag/mask and rescue breaths provided by prompt

during CPR with carotid pulse assessment during each AED prompt to CPR. Upon arrival of EMS personnel Wellpath medical staff providing emergency care response were relieved by EMS staff. At that time Wellpath medical staff exited the cell but remained on the deck. At approx. 1630 medical staff informed by EMS staff that lifesaving attempts were stopped. Wellpath medical staff had no further contact with the body and the Lt on duty closed the cell door pending further custody action.

40. On December 15, 2018 at 10:42 p.m., LPN Carla Romeo, a Wellpath employee,

wrote in Mr. Johnson's medical records:

LE: around 1615 in 4R lower tier by stairs for detox and diabetic checks, signal 35U called from cell 30 arrived pt positioned supine on bunk notable blood to right forehead, bunk and floor near cell entrance. PT unresponsive, pulseless, not breathing and cold to touch. Alternated chest compressions with first responder nurse. Copious oral secretions noted, no blood from mouth detected, AED was applied continued rescue effort chest compression and rescue breathing until relieved by EMS.

41. On December 15, 2018 at 6:05 p.m., LPN Allison Jean Knutsen, a Wellpath

employee, wrote in Mr. Johnson's medical records:

LE. During Diabetic/Detox medpass at approximately 1615 noticed unit officer standing at cell 30's door upper tier 4R. This nursed approached cell door noted blood on northside of cell. Patient presented in prone position on bunk. Blood noted around head area. Patient unresponsive, pulseless, and not breathing. Turned pt to supine position. Advised officer to call a 35 U and called for the nurse that was done stairs to come up to the cell. Started compressions. Alternated compressions with other rescuer. Called over the radio for an AED and to call EMS. Continued compressions. Charge nurse arrived with rescue bag. AED applied. Compressions and rescue breaths were alternated between the three nurses until EMS arrived and took over.

### O. EMS arrived to find Mr. Johnson dead

42. EMS arrived to find Mr. Johnson dead and documented the following:

AOS to find a 49 y.o. male pt unconscious and unresponsive with CPR being performed by facility staff. Reporting party on scene state that the pt was last

seen alive approx one hour prior to arrival. Pt was switched to EMS monitor. Compressions were taken over by E1 crew. Physical assessment revealed skin that was cold to the touch. Pupils fixed and dilated. Pulseless and apneic. Pt had a laceration superior the right eye with dried blood found next to the pt. Pt was surrounded by vomitus. Asystole was confirmed in multiple leads. Medical control was contacted. Medical control advised to cease all resuscitative measures at 16:33. Option 2 was signed by the medical representative of the pt and for the facility. The representative advised she would contact the ME.

### P. The Assaults by Defendants Zapata, Fielder and Culp and failure of these Defendants and Nueces County to provide adequate medical care resulted in Mr. Johnson's death

43. The assaults by Defendants Zapata, Fielder and Culp and the failure of Defendants Zapata, Fielder, Culp, Nueces County, Texas, Wellpath, Peeler, Bocanegra, Roberson, and Flint to provide adequate medical care to Mr. Johnson resulted in his custodial death.

### Q. Defendant Bocanegra, Licensed Professional Counselor entered notes for a Psychiatric referral of Mr. Johnson on 12/17/2018 03:10 PM CST – after Mr. Johnson's death

44. Defendant Bocanegra, a licensed professional counselor, entered notes in Mr. Johnson's medical records on December 17, 2018 at 3:10 pm purportedly for a visit on December 14, 2018.   The notes added to Mr. Johnson's medical records after his death, state that on December 14, 2018, he was not medication compliant and his appearance was marked as disheveled, his mood euphoric, his thought form was not coherent, but loose association, and his thought content delusional. These records show that there was a referral to Psychiatry, but no action had been taken to effectuate the referral and Mr. Johnson remained in his jail cell with regular population until his death on December 15, 2018.

21

### R. The Nueces County Chief Medical Examiner conducted an autopsy on Mr. Johnson's body on December 17, 2018 finding that Mr. Johnson's cause of death was acute bronchopneumonia, bilateral

45. On December 17, 2018, Ray Fernandez, M.D., the Chief Medical Examiner for Nueces County, conducted an autopsy on Mr. Johnson's body and determined that Mr. Johnson's manner of death was natural and the cause of death was acute bronchopneumonia, bilateral. However, the findings and evidence contained in Dr. Fernandez' report show facts supporting that assault was the cause of death. Further, the normal course of action is for a medical examiner to review the medical history of the individual upon which the autopsy is performed and to consider that information as part of the report. There is no evidence in Mr. Johnson's medical records maintained by the Nueces County Jail and Wellpath that support that Mr. Johnson had acute bronchopneumonia, bilateral, or that his death was natural. If Mr. Johnson did have a condition such as acute bronchopneumonia, bilateral, he should not have been in his cell, but in a hospital, with his vital signs being monitored, receiving appropriate medication, medical care and treatment. Mr. Johnson's medical records during his incarceration show that his vital signs, such as temperature, blood pressure, pulse, respirations, pulse ox were not being monitored or documented. Mr. Johnson did not receive any medication to fight an infection. Plead alternatively under FRCP 8, if Mr. Johnson did in fact have bronchopneumonia, bilateral, Defendants Zapata, Culp, Fielder, Nueces County, Texas, Wellpath, Peeler, Bocanegra, Roberson, and Flint failed to provide him with adequate

medical care for this medical condition resulting in his death. Failure to provide adequate medical treatment for acute bronchopneumonia, bilateral, leading to Mr. Johnson's death is a violation of Mr. Johnson's constitutional rights under 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement - Pretrial Detainee) and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

### S. Facts Contained in the Report of Postmortem Examination Support that an Assault of Mr. Johnson Caused His Death

46. Dr. Fernandez documented several facts in the Report of Postmortem Examination for Mr. Johnson that support that the assault by Defendants Zapata, Fielder and Culp were the cause of his death:

- Finding: Laceration to right lower forehead and left back of head
- External examination: the right orbital area has scleral hemorrhage.
- External examination: the left orbital area has petechial hemorrhages.
- External examination: The lower face area and the upper back has a moist, vomitous-type deposit.
- Evidence of injury: The upper lip, has a ¼ inch laceration. The upper frenulum and lower frenulum are intact. The right lower forehead has an oblique angled ½ inch laceration which, at the mid portion, has a ¼ inch laceration extending upward. The underlying subscalp area is slightly hemorrhagic.[6] …The left back of the head has a 1 inch oblique angled laceration. The underlying left subscalp area and left temporal are slightly hemorrahagic[7]….
- Evidence of injury: The lower left back has a ½ inch irregular abrasion. The lateral surface of the left knee has a ½ inch irregular abrasion.

---

[6] To the contrary, Dr. Fernandez documents in his Findings" No intracranial hematomas." Hemorrahagic means accompanied by or produced by hemorrhage.
[7] *Id.*

47. As telling as what was documented in the Report of Postmortem Examination by Dr. Fernandez that supports that the assault was Mr. Johnson's cause of death is what Dr. Fernandez *did not document* to support his findings. The Nueces County Jail and Wellpath maintain medical records for inmates, including Mr. Johnson. A review of those records by Dr. Fernandez would show that his conclusion about the cause of death was not supported by Mr. Johnson's medical history as there is absolutely nothing in Mr. Johnson's medical records that supports that Mr. Johnson had any condition like, near, similar associated with acute bronchial pneumonia, bilateral. An individual with such the condition of acute bronchopneumonia, bilateral, would be regularly monitored by health care providers who would have documented something to support that finding. Plead alternatively under FRCP 8, if Mr. Johnson did in fact have bronchopneumonia, bilateral, Defendants Zapata, Culp, Fielder, Nueces County, Texas, Wellpath, Peeler, Bocanegra, Roberson, and Flint failed to provide him with adequate medical care for this medical condition resulting in his death. Failure to provide adequate medical treatment for acute bronchopneumonia, bilateral, leading to Mr. Johnson's death is a violation of Mr. Johnson's constitutional rights under 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement - Pretrial Detainee) and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

48. Dr. Fernandez did not refer to any of the findings of blood, vomit, wounds to Mr. Johnson's body documented in Mr. Johnson's medical records in his Report of Postmortem Examination.

## T. Texas law requires a Custodial Death Report
## no later than the 30th day after death

49. A Custodial Death Report is required under Texas Code of Criminal Procedure

Art. 49.18. Death in Custody which states:

> if a person dies while in the custody of a peace officer or as a result of a peace
> officer's use of force or if a person incarcerated in a jail, correctional facility,
> or state juvenile facility dies, the director of the law enforcement agency of
> which the officer is a member or of the facility in which the person was
> incarcerated shall investigate the death and file a written report of the cause
> of death with the attorney general no later than the 30th day after the date on
> which the person in custody or the incarcerated person died.   The director
> shall make a good faith effort to obtain all facts relevant to the death and
> include those facts in the report.   The attorney general shall make the report,
> with the exception of any portion of the report that the attorney general
> determines is privileged, available to any interested person.

50. According to this law, the Nueces County Sheriff's Office was required to file

a Custodial Death Report for Mr. Johnson's death by January 14, 2019.

## U. Nueces County Sheriff's Office filed the Original Custodial Death
## Report for Mr. Johnson 9 days late and it states Mr. Johnson's death
## was "accidental" by means of a "fall in the shower"

51. The original Custodial Death Report filed by the Nueces County Sheriff's Office

reporting Mr. Johnson's death to the Attorney General of Texas was filed on January 23,

2019. This report was filed 37 days after the autopsy was performed by Dr. Fernandez

which gave the Nueces County Sheriff's Office more than adequate opportunity to review

the autopsy, complete an investigation and timely file the Custodial Death Report.

52. The original Custodial Death Report for Mr. Johnson stated:

**Death Date and Time:**12/15/2018 4:33 PM

**Has a medical examiner or coroner conducted an evaluation to determine a cause of death?**

**Medical Examiner/Coroner Evaluation?** Yes, pending results

**What was the manner of death? (select only one):**

**Manner of Death:** Accidental

**Medical Cause of Death**: Pending Autopsy.

**Had the decedent been receiving treatment for the medical condition that caused the death after admission to your jail's jurisdiction?**

**Medical Treatment:** No.

**Who Caused the Accident**: Decedent.

**Was the cause of death the result of a pre-existing medical condition or did the decedent develop the condition after admission?**

**Pre existing medical condition?:**   Pre-existing medical condition

**If death was an accident, homicide or suicide, what was the means of death?**

**Means of Death Other**: Fall in shower.
……..

**Specific Type of Custody/Facility:** Jail – single cell

**Where did death occur?** Scene of incident.
………..

**Summary of How the Death Occurred: (max. 30,000 characters)**

**Summary:** On Saturday, December 15, 2018 at approximately 1616 hours, Signal 35U (Inmate Down-Unknown) was called in Unit 4R, Cell #30 via radio after Officer Gage Hinojosa and Nurse A. Knutson found Inmate David Johnson unresponsive in his cell during medication pass. Upon Lt. Christopher Gomez's arrival to the scene, he observed Nurse A. Knutson already in progress of

administering chest compression as Nurse C. Morgan assisted. Nurse C. Morgan then advised Lt. Gomez to call EMS as she then applied the automatic external defibrillator. EMS was contacted and Medic 1/Engine 1 (CCFD) arrived at approximately 1622 hours and immediately took over and administered aid. After several minutes, EMS was unsuccessful at resuscitating Inmate Johnson. EMS-Lead Medic (Brannon Thompson) then pronounced Inmate Johnson deceased after conferring with hospital ER at 1633 hours. Lt. Gomez contacted Capt. Patrick Whitmore and CID Lt. Jay Worthington. The Medical Examiner's Office and the Texas Rangers were notified and the scene was secured. The custodial death is currently under investigation by TDPS Ranger Sgt. Steve West and the NCSO is awaiting results of both autopsy and investigative report.

53. The summary of how the death occurred contradicts Dr. Fernandez' autopsy conclusion as it states "fall in shower" was the cause of death, not acute bronchopneumonia, bilateral. There is no evidence in the medical records that a "fall in shower" occurred.

### V. Nueces County Sheriff's Office filed First Amended Custodial Death Report for Mr. Johnson on January 23, 2019 at same date and time as the Original Custodial Death Report

54. The Nueces County Sheriff's Office filed the First Amended Custodial Death Report for Mr. Johnson on January 23, 2019 at the same date and time as the Original Custodial Death Report. It appears to be identical.

### W. Nueces County Sheriff's Office filed Second Amended Custodial Death Report for Mr. Johnson on August 22, 2019 changes the manner of death to "natural" and medical cause of death to "acute bronchopneumonia, bilateral

55. The Second Amended Custodial Death Report reporting Mr. Johnson's death stated:

**Death Date and Time:** 12/15/2018 4:33 PM

**Has a medical examiner or coroner conducted an evaluation to determine a cause of death?**

**Medical Examiner/Coroner Evaluation?**

Yes, results are available.

**What was the manner of death? (select only one)**

**Manner of Death**: Natural

**Medical Cause of Death**: Acute bronchopneumonia, bilateral.

**Had the decedent been receiving treatment for the medical condition that caused the death after admission to your jail's jurisdiction?**

 **Medical Treatment:** Yes.

**Who Caused the Accident**: Not applicable.

**Was the cause of death the result of a pre-existing medical condition or did the decedent develop the condition after admission?**

 **Pre existing medical condition?:** Pre-existing medical condition

**If death was an accident, homicide or suicide, what was the means of death?**

 **Means of Death**: Not applicable, cause of death was illness/natural cause

……..

**Specific Type of Custody/Facility:**

Jail – single cell

**Where did death occur?**

Scene of incident.

………..

**Summary of How the Death Occurred: (max. 30,000 characters)**

**Summary:** On Saturday, December 15, 2018 at approximately 1616 hours, Signal 35U

On Saturday, December 15, 2018 at approximately 1616 hours, Signal 35U (Inmate Down-Unknown) was called in Unit 4R, Cell #30 via radio after Officer Gage Hinojosa and Nurse A. Knutson found Inmate David Johnson unresponsive in his cell during medication pass. Upon Lt. Christopher Gomez's arrival to the scene, he observed Nurse A. Knutson already in progress of administering chest compression as Nurse C. Morgan assisted. Nurse C. Morgan then advised Lt. Gomez to call EMS as she then applied the automatic external defibrillator. EMS was contacted and Medic 1/Engine 1 (CCFD) arrived at approximately 1622 hours and immediately took over and administered aid. After several minutes, EMS was unsuccessful at resuscitating Inmate Johnson. EMS-Lead Medic (Brannon Thompson) then pronounced Inmate Johnson deceased after conferring with hospital ER at 1633 hours. Lt. Gomez contacted Capt. Patrick Whitmore and CID Lt. Jay Worthington. The Medical Examiner's Office and the Texas Rangers were notified and the scene was secured. The custodial death is currently under investigation by TDPS Ranger Sgt. Steve West and the NCSO is awaiting results of both autopsy and investigative report.

56. The Second Amended Custodial Death Report is not accurate as it states that Mr. Johnson received treatment for the pre-existing condition which caused his death. Mr. Johnson's medical records do not contain any reference, mention, suggestion or any manner support that he had a condition either similar, like or related to acute bronchopneumonia, bilateral which is stated as the cause of death by the Chief Medical Examiner of Nueces County.

### X. On or about August 23, 2019, the Nueces County Sheriff's Office Initiates an Accident/Investigation of Mr. Johnson's Death

57. On or about August 23, 2019, the Nueces County Sheriff's Office initiated an accident/investigation of Mr. Johnson's death. David Johnson is identified as the victim in

the report and Defendants, Zapata, Fielder and Culp, are identified in the report as "other persons involved." Under charges, the report states, "in custody death." The date and time reported and time found read, "December 15, 2018, 19:19." There are supplements to this report which are dated, "December 27, 2018, 9:54:05"[8] and, "May 30, 2019, 9:11:08."

### Y. Defendants Zapata, Fielder and Culp were Indicated and Charged with Assault and Other Crimes against Mr. Johnson on October 17, 2019

58. On October 17, 2019, the grand jury indicted all three correctional officers who are Defendants in this case, Zapata, Fielder and Culp, for crimes against Mr. Johnson.

### a. Indictment Against Defendant Zapata

59. On October 17, 2019, the grand jury indicted Defendant Zapata with violation of Texas Penal Code § 37.10 (c)(1). Tampering with Governmental Record with Intent to Defraud and Harm, violation of Texas Penal Code § 21.15(c) Invasive Visual Recording, and violation of Texas Penal Code 39.03(d) Official Oppression related to events that occurred on December 15, 2018 against Mr. Johnson. *State of Texas v. Javier Zapata, Jr.*, Case No. 19FC-4813E, In the 148th District Court, Nueces County, Texas.   Because Mr. Johnson did not survive past these unlawful events and died as a result of them, he was not able to report any of these crimes. A crime perpetrated against Mr. Johnson was easy to cover up because he was a susceptible victim: incarcerated; had serious mental health conditions and he was basically homeless.

60. The indictment filed on October 17, 2019 in *State of Texas v. Zapata.*, Case No.

---

[8] It is not clear from the record why this supplement predated the investigation.

19FC-4813E, In the 148th District Court, Nueces County, Texas reads:

## COUNT ONE

did then and there, with intent to defraud or harm another, namely the Nueces County Sheriff's office, knowingly make a false entry in a governmental record, namely a supplemental sheet and/or supplemental report and/or an incident report supplemental sheet, the false entry being the defendant's statement concerning the facts surrounding the investigation of the custodial death of David Johnson.

## COUNT TWO-PARAGRAPH ONE

did then there, with intent to invade the privacy of David Johnson, hereafter styled the complainant, and without the consent of the complainant, photograph the complainant in a bathroom and/or changing room,

## COUNT TWO-PARAGRAPH TWO

did then there, with intent to invade the privacy of David Johnson, hereafter styled the complainant, and without the consent of the complainant, photograph the genitals OR pubic area OR anus OR buttocks of the complainant, and the complainant had a reasonable expectation of privacy that the genitals OR pubic area OR anus OR buttocks were not subject to public view,

## COUNT THREE

acting alone or together with Richard Culp and/or William Fielder, did then and there intentionally subject David Johnson to mistreatment that the defendant knew was unlawful, namely assault, and the defendant was then and there acting under color of his employment as a Nueces County Sheriff's Office Corrections Officer, against the peace and dignity of the State.

### b. Indictment Against Defendant Culp

61. On October 17, 2019, the grand jury indicted Defendant Culp with violation of Texas Penal Code § 37.10 (c)(1), and violation of Texas Penal Code 39.03(d) Official Oppression related to events that occurred on December 15, 2018 against Mr. Johnson.

*State of Texas v. Richard Culp*., Case No. 19FC-4816E, In the 148th District Court, Nueces County, Texas.   Because Mr. Johnson did not survive past these unlawful events and died as a result of them, he was not able to report any of these crimes. A crime perpetrated against Mr. Johnson was easy to cover up because he was a susceptible victim: incarcerated; had serious mental health conditions and he was basically homeless.

62. The indictment filed on October 17, 2019 in *State of Texas v. Richard Culp*, Case No. 19FC-4816E, In the 148th District Court, Nueces County, Texas reads:

### COUNT ONE

did then and there, with intent to defraud or harm another, namely the Nueces County Sheriff's office, knowingly make a false entry in a governmental record, namely a supplemental sheet and/or supplemental report and/or an incident report supplemental sheet, the false entry being the defendant's statement concerning the facts surrounding the investigation of the custodial death of David Johnson.

### COUNT TWO

acting alone or together with Javier Zapata and/or William Fielder, did then and there intentionally subject David Johnson to mistreatment that the defendant knew was unlawful, namely assault, and the defendant was then and there acting under color of his employment as a Nueces County Sheriff's Office Corrections Officer, against the peace and dignity of the State.

### c. Indictment Against Defendant Fielder

63. On October 17, 2019, the grand jury indicted Defendant Fielder with violation of Texas Penal Code § 37.10 (c)(1), and violation of Texas Penal Code 39.03(d) Official Oppression related to events that occurred on December 15, 2018 against Mr. Johnson. *State of Texas v. Richard Fielder*, 19FC-4815E, In the 148th District Court, Nueces County,

Texas.  Because Mr. Johnson did not survive past these unlawful events and died as a result of them, he was not able to report any of these crimes. A crime perpetrated against Mr. Johnson was easy to cover up because he was a susceptible victim: incarcerated; had serious mental health conditions and he was basically homeless.

64. The indictment filed on October 17, 2019 in *State of Texas v. Richard Fielder*, Case No. 19FC-4815E, In the 148th District Court, Nueces County, Texas reads:

### COUNT ONE

did then and there, with intent to defraud or harm another, namely the Nueces County Sheriff's office, knowingly make a false entry in a governmental record, namely a supplemental sheet and/or supplemental report and/or an incident report supplemental sheet, the false entry being the defendant's statement concerning the facts surrounding the investigation of the custodial death of David Johnson.

### COUNT TWO

acting alone or together with Javier Zapata and/or Richard Culp, did then and there intentionally subject David Johnson to mistreatment that the defendant knew was unlawful, namely assault, and the defendant was then and there acting under color of his employment as a Nueces County Sheriff's Office Corrections Officer, against the peace and dignity of the State.

### Z. Final Custodial Death Report filed with the Attorney General of Texas for Mr. Johnson on November 5, 2019

65. The Nueces County Sheriff's Office submitted a Final Custodial Death Report for Mr. Johnson to the Attorney General of Texas on November 5, 2019 and it appears to have no changes from the Second Amended Custodial Death Report filed on August 22, 2019.

**AA. Former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper ratified and approved of Defendant Zapata, Fielder and Culp's actions involving Mr. Johnson as being within the policies, longstanding practices and customs of the Nueces County Jail**

66. Former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper had full disclosure of the fact that Defendants Zapata, Fielder and Culp each intentionally, maliciously and sadistically assaulted and impermissibly punished Mr. Johnson and took participated in taking pornographic photos and/or video of him and assaulting him causing him serious bodily injuries which resulted in his death. Further, former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper had full disclosure that Mr. Johnson was not provided with adequate medical care by Defendants Zapata, Fielder and Culp for the injuries they inflicted upon him and others employed by and acting on behalf of the Nueces County Jail which resulted in Mr. Johnson's death.   With full knowledge of these facts, former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper ratified Defendants Zapata, Fielder, Culp's constitutional violations of Mr. Johnson's rights under 1983 - Fourteenth Amendment (Excessive Force) - Pretrial Detainees; 42 U.S.C. §1983 - Fourteenth Amendment - Bodily Integrity; 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts); and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another Failure to Intervene/Bystander Liability by allowing each to continue working for Nueces County, Texas at the Nueces County Jail without appropriate discipline.   Also, former Nueces

County Sheriff Jim Kaelin and Defendant Sheriff Hooper's final policymaking decision not to terminate these Defendants' employment or take appropriate corrective action supports that Defendants Zapata, Fielder and Culp's actions were in conformity with Nueces County, Texas and Nueces County Jail policy, practice and customs.

## V. LIABILITY UNDER 42 U.S.C. §1983, FINAL POLICYMAKING OFFICIALS FOR NUECES COUNTY, TEXAS, THE NUECES COUNTY JAIL AND LIABILITY OF WELLPATH LLC

### A. Liability under 42 U.S.C. §1983 for Constitutional Violations

67. Section 1983 of the Civil Rights of 1871, 42 U.S.C. § 1983, prohibits any person acting under color of state law from depriving any citizen or person of the rights, privileges and immunities secured by the Constitution.

68. To establish municipal liability, a plaintiff must prove three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the formal policy or custom. *Monell v. N.Y. City Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

69. For purposes of 42 U.S.C. §1983 official government policy includes:

(1) official decisions promulgated by a local government's lawmaking body;
(2) longstanding practices so persistent and widespread as to fairly represent government policy or the force of law; and
(3) the acts or policies of officials who by law or delegation possess final policymaking authority for the local government concerning the action alleged to have caused the particular constitutional or statutory violation at issue.

*See Pembaur v. Cincinnati*, 475 U.S. 469, 480-81 (1986), 475 U.S. at 480-81; *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 691 (1978); *Adickes v. S.H. Kress & Co.*, 398 U.S.144, 167-68 (1970).

### B. Nueces County Sheriffs are Final Policymakers for Law Enforcement and the Nueces County, Texas Jail

70. "[I]n Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Turner v. Upton County, Tex.* 915 F.2d 133, 136 (5th Cir. 1990); *see also Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996). Thus, the sheriff's "actions are as much the actions of the county as the actions of th[e] [county] commissioners." *Turner*, 915 F.2d at 137. In the present case, former Nueces County Sheriff Jim Kaelin was a final policymaker in the area of law enforcement and the Nueces County Jail for Nueces County, Texas from 2006 until October 31, 2018. Defendant Sheriff Hooper has been the final policymaker in the area of law enforcement and the Nueces County Jail for Nueces County, Texas from November 1, 2018 to present.

### C. Nueces County Judge and Nueces County Commissioners are Final Policymaking Officials for Nueces County, Texas

71. The Nueces County Judge and the Nueces County Commissioners are also final policy making officials for Nueces County, Texas. Nueces County's governing body is the commissioners court, which is expressly responsible for providing safe and suitable jail facilities. Tex. Loc. Gov't Code §351.001(a). The commissioners court's presiding officer is the county judge. Tex. Loc. Gov't Code §81.001. To the extent that the relevant

policymaking implicates or overlaps those two areas of responsibility—law enforcement and jail facilities—the sheriff and the county judge can be considered final policymakers. In the present case, Nueces County Judge, Sam Neal, Jr., Nueces County Commissioners, former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper were final policy making officials on behalf of Nueces County, Texas and each are responsible for, and publicly commented on the existence of, the policies at issue.

### D. Nueces County's Official Policies and Customs for the Nueces County Jail

72. The Nueces County Sheriff adopts policy for law enforcement and the Nueces County Jail and its employees, and this final policy making official has also implemented official customs. Official customs are a practice 'so persistent and widespread as to practically have the force of law.' *Peña v. City of Rio Grande City*, 879 F.3d 613, 621–22 (5th Cir. 2018). As set-out herein, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper have adopted written policies and implemented official longstanding practices and customs for law enforcement and the Nueces County Jail and its employees.

73. The Nueces County Judge and the Nueces County Commissioners adopt policy for Nueces County, Texas and is responsible for providing safe and suitable jail facilities for Nueces County, and these final policy making officials have also implemented official practices and customs. Official customs are a practice 'so persistent and widespread as to practically have the force of law.' *Peña v. City of Rio Grande City*, 879 F.3d 613, 621–22 (5th Cir. 2018). As set-out herein, Nueces County Judge Sam Neal, Jr. and the Nueces

County Commissioners have adopted written policies and implemented official customs relevant to the safety and suitability of jail facilities for Nueces County, Texas.

74. A municipality may be held liable for a single act or decision of a final policymaker, as when a municipality's properly constituted legislative body approves and executes a single unconstitutional decision. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *Pembaur*, 475 U.S. at 480. For example, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion). As set-out herein, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper have retained the authority to measure Defendant Zapata, Fielder and Culp's actions and decisions, and other actions made the basis of this complaint, and approved of those decisions, thereby ratifying the conduct and making the decision a final decision on behalf of Nueces County, Texas and supporting that the conduct of Defendants Zapata, Fielder and Culp and others involved in the incidents made the basis of this lawsuit conformed to policy, practices and customs implemented by these final policymaking officials for Nueces County, Texas and the Nueces County Jail.

**E. Wellpath LLC is a Person Acting Under Color of State Law**

75. Wellpath LLC may be considered as a person acting under color of state law for purposes of § 1983 because it is a private entity performing a state function. For Wellpath LLC to be liable under § 1983, Plaintiff must allege facts showing a policy or a custom of Wellpath LLC that caused his injury. *See Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691–94 (1978) (stating requirements for pursuing a § 1983 claim against a municipality); *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) (extending *Monell* requirements to a private entity performing a state function); *Wabuyabo v. Correct Care Sols.*, 723 F. App'x 642, 643 (10th Cir. 2018) ("[T]o state a claim against CCS, [Plaintiff] must identify an official policy or custom that led to the alleged constitutional violation.").

## VI. NUECES COUNTY, TEXAS AND NUECES COUNTY JAIL'S POLICY, LONGSTANDING PRACTICE AND CUSTOM OF CORRECTIONAL OFFICER SHORTAGES FOR NUECES COUNTY JAIL IS A MOVING FORCE BEHIND DEPRIVATION OF CONSTITUTIONAL RIGHTS

**A. Texas Commission on Jail Standards Sets Standards for Supervision of Inmates**

76. The Texas Commission on Jail Standards sets the standards for Texas Jails through the publication of regulations found in the Texas Administrative Code.

77. 37 Tex. Admin. Code § 275.1 Supervision of Inmates, Regular Observation of Inmates states:

> Every facility shall have the appropriate number of jailers at the facility 24 hours each day. Facilities shall have an established procedure for

documented, face-to-face observation of all inmates by jailers no less than once every 60 minutes. Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined. There shall be a two-way voice communication capability between inmates and jailers, licensed peace officers, bailiffs, and designated staff at all times. Closed circuit television may be used, but not in lieu of the required personal observation. Electronic sensors or cameras capable of recording the required personal observations of inmates in high-risk cells or groups of cells shall be installed no later than August 31, 2020.

78.   37 Tex. Admin. Code § 275.4 Supervision of Inmates, Staff states:

Inmates shall be supervised by an adequate number of jailers to comply with state law and this chapter. One jailer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than 1 jailer per 48 inmates or increment thereof on each floor for direct inmate supervision. This jailer shall provide documented visual inmate supervision not less than once every 60 minutes. Sufficient staff to include supervisors, jailers and other essential personnel as accepted by the Commission shall be provided to perform required functions. A plan concurred in by both commissioners' court and sheriff's office, which provides for adequate and reasonable staffing of a facility, may be submitted to the Commission for approval. This rule shall not preclude the Texas Commission on Jail Standards from requiring staffing in excess of minimum requirements when deemed necessary to provide a safe, suitable, and sanitary facility nor preclude submission of variance requests as provided by statute or Chapter 299 of this title.

79.   Contrary to the regulations published by the Texas Commission on Jail Standards, the Nueces County Jail was routinely staffed with insufficient guards, often with a ratio as much as 72:1 and the Nueces County Jail failed to meet these standards of supervision of inmates.

## B. Longstanding Policy, Practice and Custom of Staffing Shortages of Correctional Officers at the Nueces County Jail

80. On July 9, 2018, at the Nueces County Commissioners Court Budget Workshop,

Nueces County Sheriff Jim Kaelin, told the Nueces County Judge, Samuel L. Neal, Jr., and Nueces County Commissioners when asking for additional funding for the Nueces County Jail that staffing levels for the Nueces County Jail average 25 vacancies. Also, during the meeting, Former Nueces County Sheriff Kaelin told the Nueces County Judge and Nueces County Commissioners that, "maintaining the staffing in the jail becomes more difficult everyday of getting people to come down and wanting to make a career of working inside that environment." Nueces County Sheriff Kaelin stated there had been up to 35 vacancies and they "made some noise" and were able to bring that number down.   Sheriff Kaelin stated that he considered 10 or less vacancies for the Nueces County Jail to be fully staffed. However, an average of 25 vacancies for the Nueces County Jail was causing problems – both in locating manpower, but also budget problems because even if current employees are willing to work extra shifts, overtime came into play for both the employee working an extended shift the jailer working the extra shift which was causing problems for Nueces County, Texas.

81. Nueces County, Texas' policy not to adequately fund the Nueces County Jail to provide for adequate staffing, as made through the Nueces County Commissioner's Court and Nueces County Judge, is a final policymaking decision for purposes of 42 U.S.C. §1983.

82. Defendant Sheriff Hooper has also frequently and openly stated that the Nueces County Jail has a severe staffing shortage. For example, Sheriff Hooper made the following statements in the Corpus Christi and surrounding media:

On August 27, 2019, reported by Monica Lopez with the Caller Times in an article entitled, Nueces County Sheriff's Office reveals new wrapped van for recruitment, Sheriff Hooper stated in a published video interview: "We have been struggling to stay fully staffed and it is not just something that this Sheriff has been dealing with. Every Sheriff before me has been dealing with staffing shortages. We're hiring. That is the message we want to get out there. We're hiring."

On August 27, 2019, KIII 3 Television news ran a story entitled, Nueces County Sheriff's Office wraps prisoner transport van to recruit new hires in which Michael Gibson reported: Sheriff Hooper says that trying to keep enough jailers on staff has been a historical problem for the department. Right now, they are two dozen people short…..

### C. Former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper are Final Policymakers Whose Decision to Resolve the Staffing Shortage by Maintaining the Employment of Correctional Officers that Violate Inmates Constitutional Rights is a Moving Force Behind Deprivation of Constitutional Rights

83. The final policymaking officials relative to employment decisions for employees of the Nueces County Jail, the Nueces County Sheriffs, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, have had a policy, practice and custom that they will not terminate a correctional officer who violates an inmates' constitutional rights and/or law. The policy, custom and practice is that instead of terminating the employment of correctional officers who violate an inmates' constitutional rights and/or law, the Nueces County Sheriff defers to the criminal process to determine whether or not to determine "guilt" of the correctional officer and then to determine discipline. This policy, custom and practice is a moving force behind deprivation of inmate's rights to be free from constitutional violations of excessive force and violations of bodily integrity.

84. The final policymaking officials relative to employment decisions for employees

42

of the Nueces County Jail, the Nueces County Sheriffs, former Sheriff Kaelin and Defendant Sheriff Hooper, have had a policy, practice and custom that they fail to provide serious punishment when charges of excessive force and/or impermissible punishment are sustained but instead provide trivial punishment that is not designed to act as a deterrent to the use of excessive force and/or improper punishment and in fact does not deter it. This policy, custom and practice is a moving force behind deprivation of inmate's rights to be free from constitutional violations of excessive force and violations of bodily integrity.

85. The final policymaking officials relative to employment decisions for employees of the Nueces County Jail, the Nueces County Sheriffs, former Sheriff Kaelin and Defendant Sheriff Hooper, have had a policy, practice and custom that they fail to investigate and discipline individual and groups of officers who have engaged in patterns of abuse and brutality toward inmates constituting impermissible punishment of inmates in the Nueces County Jail.  This policy, custom and practice is a moving force behind deprivation of inmate's rights to be free from constitutional violations of excessive force and violations of bodily integrity.

86. The final policymaking officials relative to employment decisions for employees of the Nueces County Jail, the Nueces County Sheriffs, former Sheriff Kaelin and Defendant Sheriff Hooper, have had a policy, practice and custom that they fail to adequately track complaints against correctional officers to identify patterns within the Nueces County Jail, repeat offending officers, or additional measures that are needed to prevent constitutional violations by Nueces County Jail correctional officers. This policy,

custom and practice is a moving force behind deprivation of inmate's rights to be free from constitutional violations of excessive force and violations of bodily integrity.

87. Constitutional violations against inmates are civil, not criminal.   Whether or not a correctional officer is guilty of a crime against an inmate does not mean that the correctional officer did not violate the inmate's constitutional rights. Criminal actions have a higher burden of proof than a civil an action for violation of civil rights. Therefore, this policy, custom and practice of the Nueces County Sheriffs is not sound and it is a moving force behind continued constitutional violations by those correctional officers.

88. As an example of this policy, custom and practice, on August 2, 2017, Katherina Gail Morin, a Nueces County correctional officer at the Nueces County Jail, allegedly assaulted and struck an inmate while transferring the inmate between cells. According to an affidavit, Ms. Morin asked a fellow officer to assist her while transferring the inmate to another cell. When they arrived at their destination, the officer said Morin entered the cell with the inmate and proceeded to grab her by the shirt and slam her against the wall. Morin then threw the inmate onto the bunk and struck her twice in her ribs. Ms. Morin was arrested for aggravated assault and later charged with assault causing bodily injury, Case No. 18MC-10231, Nueces County Court at Law 3.   Former Nueces County Sheriff Kaelin briefly suspended Ms. Morin. However, Sheriff Kaelin allowed Ms. Morin to continue working until she later resigned her position.   Ms. Morin had been suspended without pay for 16 hours approximately eight months earlier for passing around contraband at the Nueces County Jail, but she was allowed to return and continue working.   Even though

passing around contraband is against the law, Former Nueces County Sheriff Kaelin allowed Ms. Morin to continue working as a correctional officer.   If Ms. Morin had been terminated upon violating the law, she would not have been in a position to assault and strike an inmate resulting in constitutional violations of excessive force and bodily integrity.

89. As another example of this policy, custom and practice, in a November 21, 2017 news report, former Nueces County Sheriff Jim Kaelin stated to Channel 3 Television news in regard to the pipe beating of a jail inmate by two Nueces County Jail correctional officers, Anthony Munoz and Raul Rene Flores, "It's still, it's an accusation, alright, and they'll have their day in court." However, he did not terminate the employment of the correctional officers and each later resigned. By Sheriff Kaelin not immediately terminating Mr. Munoz and Mr. Flores for the constitutional violations of excessive force and bodily integrity, he sent a message that pipe beating and assault of inmates is acceptable and within the policy, customs, and practices of the Nueces County Jail.   Also, by not immediately terminating Mr. Munoz and Mr. Flores, they remained in a position to continue to harm inmates.

90. Another representation of this policy, custom and practice is when on or about June 2018, Nueces County Jail inmate, Patrick Durkin, was experiencing psychiatric problems while in the Nueces County Jail.   While in custody, Mr. Durkin had his hands handcuffed and he was taken to a suicide watch cell that is has a blind spot and the area is not visible on camera.   Mr. Durkin was thrown on the ground resulting in his rib being

broken. Defendant Zapata participated in the injury to Mr. Durkin. Nueces County failed to adequately treat Mr. Durkin for his mental health condition and broken ribs. Sheriff Kaelin allowed Defendant Zapata to continue working despite this clear violation of an inmate's constitutional rights. If Sheriff Kaelin had immediately terminated Defendant Zapata for his unconstitutional behavior involving Mr. Durkin, he would not have been in a position to violate Mr. Johnson's constitutional rights leading to his death.

91. Similarly, this policy, custom and practice was followed when on June 13, 2019, three Nueces County jailers were indicted for making a false entry in a report related to the use of force resulting in the injury of Nueces County Jail inmate Christina Martinez. The three jailers are: Oliver Michael Buendia, Marcus Lopez and Javier Zapata, Jr., who is a Defendant in this case. Each was charged with a third-degree felony count of tampering with government records related to the investigation of the complaints made by inmate Christina Martinez for events occurring on July 6, 2018 which resulted in Ms. Martinez being injured. Defendant Sheriff Hooper placed Mr. Buendia and Mr. Lopez on paid administrative leave, but did not terminate their employment. Currently, Mr. Buendia and Mr. Lopez remain actively working for the Nueces County Jail. By June 13, 2019, Defendant Zapata had already voluntarily left employment with the Nueces County Jail. By Sheriff Kaelin and Defendant Sheriff Hooper not immediately terminating Mr. Buendia, Mr. Lopez and Defendant Zapata for the constitutional violations of excessive force, bodily integrity and for tampering with a government document covering-up the violations, each sent a message that this conduct is acceptable and within the policy, customs, and practices

of the Nueces County Jail.   Also, by not immediately terminating Mr. Buendia, Mr. Lopez and Defendant Zapata, they remained in a position to continue to harm inmates. In fact, the incident involving Ms. Martinez occurred on July 6, 2018.   If Sheriff Kaelin had immediately terminated Defendant Zapata for his unconstitutional behavior involving Ms. Martinez, Defendant Zapata would not have been in a position to violate Mr. Johnson's constitutional rights leading to his death.

92. Another instance of this policy, practice and custom in action is when on September 2, 2019, an affiant stated that Nueces County Jail Correctional Officer, Bobby J. Benavides, assaulted an inmate. Surveillance footage captured the assault and showed Mr. Benavides hit the inmate more than 25 times, resulting in the inmate suffering a fractured rib.  Nueces County Sheriff's Office officials began looking into the suspected assault on Sept. 18, a day after the office received a form from the inmate about the assault. Mr. Benavides was arrested on suspicion of aggravated assault causing serious bodily injury by a public servant, a first-degree felony; tampering with or fabricating physical evidence with intent to impair, a third-degree felony; and official oppression. Mr. Benavides was initially placed on leave by Defendant Sheriff Hooper, but later he was allowed to resign.   This is another example of the policy, practice and custom which send the message that this type of conduct is within Nueces County policy.

93. This policy, practice and custom was applied to the present case when on October 23, 2019, Defendant Sheriff Hooper stated to the media in reference to Defendants Zapata, Fielder and Culp, "their actions around the time of the death were

policy violations in our mind. And so, they were disciplined retrained and put back to work, and they're still on the job, the sheriff says they'll continue working at the county jail throughout the legal process these employees are innocent until proven guilty." It is difficult to understand how assaulting an inmate causing serious bodily injury resulting in death and invading an inmate's privacy by taking pornographic photographs of Mr. Johnson without his consent by having his genitals and/or pubic area and/or anus and/or buttocks photographed are constitutional violations for which nothing less than immediate termination of employment is appropriate.   Defendant Sheriff Hooper's public admission that he did not properly train Defendants Zapata, Fielder and Culp and that they had to be retrained supports that Defendant Sheriff Hooper failed to provide adequate training to prevent the constitutional violations which occurred to Mr. Johnson made the basis of this lawsuit. Further, Defendant Sheriff Hooper allowed Defendants Fielder and Culp to continue in their positions as correctional officers with the opportunity to continue the serious, disturbing, malicious, sadistic and intentional constitutional violations of excessive force and bodily integrity against inmates. Also, Defendant Sheriff Hooper's failure to implement meaningful discipline is a clear message that Defendants Zapata, Fielder and Culp's conduct in violating Mr. Johnson's constitutional rights and covering-up their violations is acceptable and within the customs and practices of the Nueces County Jail.

94.   Defendant Sheriff Hooper's policy that Defendant Zapata, Fielder and Culp are "innocent until proven guilty" and "we'll let the process work and go from there," supports that Defendant Sheriff Hooper's final policymaking decision is a moving force

behind these violations because it allows correctional officers to continue working and continue violating inmate rights. As an example, Defendant Zapata violated several inmate's constitutional rights, including Ms. Martinez' rights and Mr. Durkin's rights as set-out above, and was allowed to continue to work under both former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper. If former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper had taken proper action to stop Defendant Zapata's constitutional violations of inmates' rights related to excessive force and bodily integrity, he would not have been in a position to have violated Mr. Johnson's constitutional rights leading to his death.

95. Defendant Zapata voluntarily left his employment with the Nueces County Jail in January 2019. Neither former Nueces County Sheriff Kaelin nor Defendant Sheriff Hooper terminated the employment of Defendants Zapata, Fielder or Culp as a result of their own knowledge that each violated Mr. Johnson's constitutional rights violation of §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts) and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another Failure to Intervene/Bystander Liability. Former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper's final policymaking decision for Nueces County related to the employment of these correctional officers ratifies Defendant Zapata, Fielder and Culp's conduct and

shows that their conduct was within Nueces County policy, practices and customs.

96. The final decisions, policies, customs, failure to train and supervise, made by former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper, show "deliberate indifference" to the obvious consequence of the failure to supervise, failure to train and the policymakers' decisions and policies set-out above which result in the retention of employees who violate inmate's constitutional rights, which is the moving force behind the deprivation of constitutional rights directly causing injury to Nueces County Jail inmates and Mr. Johnson because it allows the correctional officers to be in a position to continue with their unconstitutional conduct toward inmates. Former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper's final policymaking decisions also support that Defendants Zapata, Fielder and Culp's conduct was within the customs, practices and policies of the Nueces County Jail.

### D. The Policy, Longstanding Practice and Custom of Nueces County, Texas and the Nueces County Jail to Fail to Adequately Fund, Fail to Recruit and Fail to Keep Qualified Jailers Results in Retaining Jailers that Violate Inmate's Constitutional Rights

97. The policy of Nueces County, Texas as made by the Nueces County Commissioners and Nueces County Judge in not providing appropriate funding to staff safe and suitable jail facilities for Nueces County, Texas is a final policymaking decision for purposes of liability under 42 U.S.C. §1983. This policy is discussed in paragraphs 80-81 of this complaint.

98. The policy, longstanding practices and custom of the Nueces County Jail as made

by final policymakers, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, in not adequately recruiting and keeping adequate staffing of jailers is a final policymaking decision for purposes of liability under 42 U.S.C. §1983. This policy is discussed in paragraphs 80-96 of this complaint.

99. The result of these policies, practices and customs is that former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper make a clear policy and choice to retain jailers that violate inmate's constitutional rights in order to keep enough staffing to operate the Nueces County Jail.

100. By not having appropriate funding to staff a safe and suitable jail and not adequately recruiting and keeping adequate staffing of jailers, these policies shows "deliberate indifference" to the obvious consequence of the policymakers' choice, and it is the moving force behind a deprivation of constitutional rights directly causing injury to Nueces County Jail inmates including Mr. Johnson. The constitutional violations being a violation of an inmate's constitutional rights violation of §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

**VII. NUECES COUNTY, TEXAS AND NUECES COUNTY JAIL'S POLICY, LONGSTANDING PRACTICE AND CUSTOM OF HOUSING MENTALLY ILL INMATES WITH THE GENERAL JAIL POPULATION, WITHOUT PROVISIONS FOR ADEQUATE MENTAL HEALTH CARE AND WITHOUT ADDRESSING THE SPECIAL NEEDS OF SUCH INMATES IS A MOVING FORCE BEHIND DEPRIVATION OF CONSTITUTIONAL RIGHTS**

### A. It is Clearly Recognized that Inmates with Mental Health Disorders Have Special Needs

101. A significant percentage of county jail inmates have mental disorders. Jails are not designed or operated to provide a therapeutic setting; the lights, noise, rules, and real and perceived threats of violence are especially harmful to inmates with mental disorders.[9] They are likely to stay for longer periods, have difficulty following facility guidelines, and spend more time in solitary confinement.[10] Often, their mental health deteriorates, making them harder to manage for staff.[11] When untreated, they are more likely to be the victims of violent behavior or to initiate violent acts.[12]

102. In Texas, state health officials estimate that 30 percent of jail inmates have one or more serious mental illnesses.[13] Inmates with mental illness are more likely to be subjected to physical attacks and victimization, and to solitary confinement.[14]

---

[9] *Id.*
[10] Preventable Tragedies, How to Reduce Mental Health-Related Deaths in Texas Jails, citing Treatment Action Center, The Treatment of Persons with Mental Illness in Prisons and Jails: A State Survey, April 2014 7, 14-17 (2014).
[11] *Id.*
[12] *Id.*
[13] Preventable Tragedies, How to Reduce Mental Health-Related Deaths in Texas Jails citing Lauren L. Lewis, Presentation to the Senate Criminal Justice Committee (2015)
[14] Preventable Tragedies, How to Reduce Mental Health-Related Deaths in Texas Jails citing Treatment Action Center, The Treatment of Persons with Mental Illness in Prisons and Jails: A State Survey, April 2014 7, 14-17 (2014)

103. Nueces County did not properly hire and train law enforcement personnel in how to recognize and manage Nueces County Jail inmates with mental health conditions such as Mr. Johnson.[15] According to an article published by the Corpus Christi Caller Times on September 25, 2019, Defendant Sheriff Hooper admitted in October 2018 that he would find ways to address inmates who had mental health issues, saying they shouldn't be there [referring to the Nueces County Jail]. This admission by Defendant Sheriff Hooper supports that Nueces County, Texas' policy, practice and custom is a moving force behind inadequate mental health and medical care for Nueces County Jail inmates.

104. At the Regular Board Meeting of the Nueces County Commissioners held on March 14, 2018, final policymakers for Nueces County, Texas and the Nueces County Jail acknowledged the practice of housing mentally ill inmates with the general jail population, without provisions for adequate mental health care and without addressing the special needs of such inmates. Final policymaker, Nueces County Judge, Sam Neal, Jr., stated that counties across Texas, particularly urban counties have the greatest problem of mental health in their jails, of any county or any state in the United States and Nueces County is like that. County Judge Neal went on to say that on any given day, we have about 900 prisoners in our jails and statistics say that 20 to 25 percent of jail inmates have mental problems that indicate that they do not belong in jail; they belong in a treatment facility. However, despite this issue being a longstanding well-known problem, Nueces County did

---

[15] *See Carrillo v. Buendia*, et al, Civil Action No. 2: 20-cv-00028, Order on Motion to Dismiss, page 8.

not make a separate treatment facility available for mentally ill inmates such as Mr. Johnson.[16]

105. At the time of Mr. Johnson's death, Nueces County, Texas and the Nueces County Jail, through their final policymakers, the Nueces County Commissioners, Nueces County Judge and Nueces County Sheriffs had a policy of housing mentally ill inmates with the general population.

106. Also, the Nueces County Jail had a policy, pattern and practice of not complying with the legal requirements under the Sandra Bland Act, Texas Code of Criminal Procedure Art. 16.22. <u>Early identification of defendant suspected of having mental illness or intellectual disability</u> relevant to inmates at the Nueces County Jail, including Mr. Johnson, by failing to have the inmate timely and properly evaluated for mental health conditions and by failing to provide required notices to the magistrate which denied him protections and rights under the Act.

107. The policy, practice and custom of receiving, housing, and handling mentally ill inmates at the Nueces County jail in the same manner as mentally healthy inmates did not change until a new policy was adopted by the Nueces County Commissioners Court in September 25, 2019 with an emphasis on "jail diversion." According to the Corpus Christi Caller Times, "Jail diversion services will include pre- and post-booking services that will identify people with mental health and substance abuse issues, the agreement states.

---

[16] March 14, 2018 Nueces County Commissioners Court – Regular Meeting Minutes; *Carrillo v. Buendia*, et al, Civil Action No. 2: 20-cv-00028, Order on Motion to Dismiss, page 8.

Officials will then redirect them from jail to treatment and support services, the agreement states. Jail diversion will also include a crisis intervention services that aim to conduct a pre-booking assessment to direct people to services they may need before they are taken to jail, the agreement reads." This policy was adopted approximately 9 months after Mr. Johnson's death.

108. A majority of the inmates that have died while in custody at the Nueces County Jail since 2017 also have a history of mental health disabilities such as Mr. Johnson. These statistics have occurred under the Health Services Agreement between Nueces County, Texas and Wellpath LLC and its predecessor CCS. According to the Custodial Death Reports filed by the Nueces County Sheriff's Office with the Attorney General of Texas, the last 7 out of 8 inmates that died in custody at the Nueces County Jail had a mental health condition. Those inmates are:

| Decedent Inmate's Name | Date of Death |
|---|---|
| Cristobal Flores | 09/20/2017 |
| Danny Carrillo | 03/05/2018 |
| David L. Gomez | 07/25/2018 |
| David Johnson | 12/15/2018 |
| Anthony Thompson | 09/04/2019 |
| Maria I. Cabrera | 02/06/2020 |
| Mohammed Sahi | 04/26/2020 |

109. These statistics support that Nueces County, Texas and the Nueces County Jail did not have policies in place to take appropriate action to identify, adequately treat and house inmates with mental health conditions such as Mr. Johnson.

110. What is also disturbing is that despite the fact that the Custodial Death Report requires a disclosure of whether or not the inmate had a mental health condition, the Nueces County Sheriff's Office left this portion of the form blank in all reports filed from August 6, 2005 through June 20, 2016, which are the following Custodial Deal Reports filed with the Attorney General of Texas:

| Decedent Inmate's Name | Date of Death |
|---|---|
| Mark D. Golding | 08/06/2005 |
| Santos Guajardo | 02/08/2006 |
| Howard E. Eller | 06/08/2008 |
| Roberto R. Garcia | 08/31/2008 |
| William A. Evans | 02/16/2009 |
| Samuel Salazar | 02/07/2010 |
| Kathy M. Castillo | 07/03/2010 |
| Dennis Bridges | 01/06/2011 |
| Gregory Cheek | 02/07/2011 |
| Cruz Clark | 09/08/2011 |
| John R. Wallace | 04/02/2013 |
| Samuel E. Toomey | 09/19/2014 |
| Pedro Quiroz | 07/24/2015 |
| Steven R Maldonado | 09/16/2015 |
| Gregg O. Dentler | 04/21/2016 |
| Santos Mungia | 06/20/2016 |

111. Again, these statistics support that Nueces County, Texas and the Nueces County Jail did not have policies in place to take appropriate action to identify, treat and house inmates with mental health conditions and the failure to have these policies in place lead to the custodial deaths of mentally disabled inmates.

112. Nueces County has also been on notice of the problem with housing mentally ill inmates with the regular jail population. For example, in an August 2020 Order, the trial

court in *Armando Carrillo, et al, v. Oliver Buendia*, *Nueces County, Texas et al*, Civil Action 2:20-cv-00028, In the United States District Court, Southern District of Texas, Corpus Christi Division, Order on Motion to Dismiss, DE 70, pages 43-44, Judge Nelva Gonzales Ramos wrote relevant to this issue wrote: "For instance, in *Green v. Nueces County, Texas*, Civ. A. No. C-09-316, (S.D. Tex. Mar. 15, 2010), the court recites four instances of improper treatment of the same mentally ill inmate: (1) an unprovoked beating and tasing in the jail; (2) being forced to spend three days in his cell without his clothes; (3) another series of beatings over two days associated with a court appearance; and (4) trying to prevent the inmate's mother from seeing him while he was hospitalized. In *Cheek v. Nueces County, Texas,* Civ. A. No. 2:13–CV–26, 2013 WL 4017132 (S.D. Tex. August 5, 2013), there were also four instances of improper treatment: (1) the mentally ill inmate was denied prescribed anti-psychotic medication; (2) he was denied visitation by his mother because he could not remember her date of birth; (3) his physical illness was left untreated as it was blamed on his psychotic behavior rather than on the infection he was suffering; and (4) the denial of his psychiatric medications made him incapable of communicating his physical complaints, even after it was clear that medical staff needed his account of his symptoms. The *Cheek* opinion put the County on notice that the pleading of a claim for unconstitutional conditions facing inmates with psychiatric illnesses could be sustained under *Monell*. Yet five years later, the same policy was in place, not decried by the policymakers until days after Carrillo's death. Without determining whether these

facts are sufficient to sustain liability after trial, the Court finds them sufficient to state a plausible claim of a policy maintained with deliberate indifference at the pleading stage."

113. The Court in *Armando Carrillo, et al*, Order on Motion to Dismiss, DE 70, page 42, further wrote, "This policy is alleged to be widespread in that it affects conditions of confinement and vulnerability to excessive force applicable to 20 to 25 percent of the jail population. Such persons have medical needs that cannot be adequately addressed in the County jail. And this is the case regardless of whether the policy regularly manifests in situations sufficient to give rise to justiciable claims of excessive force or failure to provide medical care.[17] That is the import of the policymakers' alleged admissions: there was a widespread policy of unconstitutional conditions of confinement (particularly lack of mental health medical care) that set the stage for occasional, but significant, personal injury and death from excessive force."

114. Nueces County, Texas has been aware of prior constitutional violations based upon the *Carrillo, Green* and *Cheek* cases cited above. The existence of prior constitutional violations supports deliberate indifference relevant to causation or the "moving force" of the policy. In the present case, Mr. Johnson was placed in general population, where there is insufficient medical monitoring, treatment and protection of his physical and mental conditions.   Nueces County, Texas, Nueces County Jail and Wellpath LLC were aware

---

[17] FN9 of the Order, "Plaintiffs do not need to identify numerous similar cases to demonstrate a practice or custom so widespread as to constitute policy because the admissions already satisfy that issue. Rather, the existence of prior cases of constitutional violations—which need not be numerous—support the deliberate indifference relevant to causation or the "moving force" of the policy."

that Mr. Johnson had a mental health condition, schizoaffective disorder, depressive type, and that he needed special treatment for that condition. In general population, the Nueces County Jail correctional officers are not hired and trained to identify and handle the needs of inmates with mental health conditions such as Mr. Johnson leaving them not only lacking in medical, psychological and/or psychiatric services, but also placing these vulnerable individuals in a position to be easy targets of violence, assaults, excessive force and similar acts of violation of bodily integrity as were perpetrated by Defendants Zapata, Fielder and Culp against Mr. Johnson.   Mr. Johnson was improperly treated by: (1) repeatedly not being provided with adequate medical care for his mental health and medical conditions when he refused his medication and was displaying problems associated with his mental health conditions; (2) his privacy invaded by Defendants Zapata, Fielder and Culp by without his consent by having his genitals and/or pubic area and/or anus and/or buttocks photographed; (3) an unprovoked assault by Defendants Zapata, Fielder and Culp causing serious injury and death; (4) being denied appropriate protection and adequate medical care even though he yelled for help, was found with a wound to his head and he was so weak that he could not stand on his own power; (5) being neglected by being left in his jail cell to die, and (6), plead in the alternative, if Mr. Johnson had acute bronchopneumonia, bilateral, he was denied medical care for this condition.

115. The policy of Nueces County, Texas and the Nueces County Jail of housing mentally ill inmates with the general jail population, without provisions for adequate mental health care and without addressing the special needs and vulnerabilities to violence

of such inmates. Nueces County is liable for the actions of its employee jailers who injured and failed to provide appropriate mental health and medical care to Mr. Johnson leading to his death because the events and conditions that resulted in his death were direct results of the County's 2018 policy, practice and custom of admitting mentally ill inmates and housing and handling them in the same manner as the general jail population. The custom or policy obviously existed, since a new policy replaced it in September 2019. The former and current Nueces County Judge's and Nueces County Sheriff's own words prove the prior custom was well known.   The policy is the moving force for the constitutional deprivations.

### VIII. NUECES COUNTY, TEXAS AND NUECES COUNTY JAIL'S POLICY, LONGSTANDING PRACTICE AND CUSTOM OF NOT HAVING ENOUGH INMATE BEDS IS A MOVING FORCE BEHIND DEPRIVATION OF CONSTITUTIONAL RIGHTS

116. Another policy, longstanding custom and practice of the Nueces County Jail is not having enough inmate beds at the Nueces County Jail which is a moving force behind deprivations of constitutional rights.   Inmate beds include a classification system that determines who get beds and where the beds are located.

117.   Former Nueces County Sheriff Jim Kaelin in a July 31, 2018 interview with KRIS 6 News stated that inmate overcrowding at the jail is nearing a crisis point. Sheriff Jim Kaelin stated that the classification system that determines who gets beds is a contributing factor. In July 2018, the Nueces County Jail reached 97% capacity. KRIS 6 News reported that former Sheriff Jim Kaelin stated that jail overcrowding is a consistent

problem and it's one that county can't ignore. Sheriff Kaelin said to lock down a solution the county needs to financially commit to expanding the jail. The county jail is consistently overcrowded with 1068 beds, but it gets very complicated when you get involved with jail standards. That's because beds are assigned based on how an inmate is classified. That classification determines where they are housed. This is for their protection. Sheriff Jim Kaelin stated in the interview, "We run out of places to put people because one classification area may be full just like the jail population." This problem has been building up over decades. Sheriff Kaelin continued, "This county hasn't really added any beds since 1991. In those more than 20 years, the community has grown. but you have to add more beds to keep up with your growth." Sheriff Kaelin stated, "we have to add more beds, then we wouldn't be in bad shape. Now. It's just a matter of saying we must start. Well, nobody started."

118. In regard to inmate classification referenced by former Nueces County Sheriff Kaelin, 37 Tex. Admin. Code § 271.1 states:

(a) Each sheriff/operator shall develop and implement an objective classification plan approved by the Commission by January 1, 1997. The plan shall include principles, procedures, instruments and explanations for classification assessments, housing assignments, reassessments and inmate needs. Plans utilizing an approved objective classification system shall be submitted and approved by the Commission. The following principles and procedures shall be addressed:

(1) inmates shall be classified and housed in the least restrictive housing available without jeopardizing staff, inmates or the public, utilizing risk factors which include any or all of the following:

(A) current offense or conviction;

61

(B) offense history;
(C) escape history;
(D) institutional disciplinary history;
(E) prior convictions;
(F) alcohol and/or drug abuse; and
(G) stability factors.

(2) classification criteria shall not include race, ethnicity or religious preference;

(3) custody levels and special housing needs shall be assessed to include minimum, medium and maximum custody levels and the placement and release of inmates to and from special units including protective custody, administrative separation, disciplinary separation and mental and medical health housing including known pregnant inmates;

(4) minimum and maximum custody level inmates shall be housed separately. All other custody level inmates should be housed separately. When under direct, visual supervision, inmates of different custody levels may simultaneously participate in work and program activities;

(5) juveniles shall be separated by sight and sound from adults in accordance with the Family Code, §51.12;

(6) female inmates shall be separated by sight and sound from male inmates. When under direct, visual and proximate supervision, males and females may simultaneously participate in work and program activities;

(7) when housed together and separately from all other inmates, contracted TDCJ-ID and federal inmates may be classified solely by approved TDCJ-ID and federal classification policies and procedures, respectively. Housing units for contracted TDCJ-ID and federal inmates shall be approved by TDCJ-ID and federal officials, respectively, to ensure that the inmates' custody level does not exceed the construction security level of the assigned housing;

(8) the following shall apply to prisoners in transit:

(A) an inmate is a prisoner in transit if the agency charged with the custody of the inmate is transporting the inmate from one jail or detention facility to another jail or detention facility;

(B) when housed together and separately from all other inmates, prisoners in transit transported by another agency may be temporarily housed in a facility if the transporting agency

62

provides a written statement that the prisoners can be safely housed together;

(C) when housed they shall be confined in maximum construction level housing;

(D) females shall be separated by sight and sound from males;

(E) observation shall be performed at least every 30 minutes;

(F) they shall not be held in a facility for more than 48 consecutive hours;

(G) the facility providing temporary housing is not required to check prisoners in transit against the Department of State Health Services' CCQ system to determine if the prisoner has previously received state mental healthcare; and

(H) a transporting agency may include a private correctional company engaged in the transportation of prisoners;

(9) persons assigned to a detoxification cell shall be transferred to a housing or holding area as soon as they can properly care for themselves;

(10) the status of persons confined to a violent cell shall be reassessed and documented at least every 24 hours for continuance of status;

(11) inmates who require protection or those who require separation to protect the safety and security of the facility may be housed in administrative separation. The status of inmates placed in administrative separation shall be reviewed and documented at least every 30 days for continuance of status. Inmates housed in administrative separation shall retain access to services and activities, unless the continuance of the services and activities would adversely affect the safety and security of the facility; and

(12) single cells may be utilized for disciplinary or administrative separation. Inmates in administrative separation shall be provided access to a day room for at least one hour each day. Inmates in disciplinary separation shall be provided a shower every other day.

(b) The following classification procedures shall be conducted utilizing the approved classification instruments.

(1) Intake Screening. To be completed immediately on all inmates admitted for purposes of identifying any medical, mental health or other special needs that require placing inmates in special housing units;

(2) Initial Custody Assessment. To be completed on all newly admitted inmates prior to housing assignments to determine custody levels.

(3) Custody Reassessment/Review. A custody reassessment shall be conducted within 30 - 90 days of the Initial Custody Assessment and immediately upon any disciplinary action and/or change in legal status which would affect classification. A documented classification review to determine the necessity for a complete reassessment shall be conducted every 30 - 90 days thereafter.

(c) A Needs Assessment Instrument may be used to assess the needs and qualifications of inmates for participation in vocational, educational, mental health, substance abuse and other treatment or work programs.

119. In regard to 37 Tex. Admin. Code § 271.1(a)(3), neither the Nueces County Commissioners Court and Nueces County Judge funded nor did the former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper implement a plan to establish appropriate mental and medical health housing.

120. The policy, longstanding practice and custom of not having enough inmate beds to serve all inmate classifications, including inmates with medical and mental health problems such as Mr. Johnson, is a moving force behind the deprivation of the constitutional rights of Nueces County Jail inmates, including Mr. Johnson. This policy, longstanding practice and custom results in inmates with mental health disabilities such as Mr. Johnson being placed in regular population where correctional officers and other staff are not trained to handle the special medical and other needs of individuals with mental health disabilities.   Further, it places inmates such as Mr. Johnson in a vulnerable position to be the victim of violent acts constituting unconstitutional punishments and violations of bodily integrity in violation of the Fourteenth Amendment to the United States

Constitution. Also, this policy denies adequate medical and mental health care required by law to inmates.

121. By the Nueces County Commissioners Court and Nueces County Judge not providing appropriate funding to have enough inmate beds to serve all inmate classifications, including inmates with medical and mental health problems, such as Mr. Johnson, this intentional lack of funding and lack of adopting a policy shows "deliberate indifference" to the obvious consequence of the policymakers' choice, and it is the moving force behind a deprivation of constitutional rights directly causing injury to inmates with mental health conditions including Mr. Johnson. By failing to provide appropriate inmate housing for inmates with medical and mental health conditions, Nueces County, Texas and Nueces County Jail chose to leave this vulnerable inmate population open to violence from corrections officers and other inmates resulting in constitutional violations.   The deprivation of constitutional rights being a violation of an inmate's constitutional rights under §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

## IX. NUECES COUNTY, TEXAS, NUECES COUNTY JAIL, DEFENDANT SHERIFF HOOPER, INDIVIDUALLY, AND WELLPATH LLC FAILED TO PROPERLY AND ADEQUATELY HAVE AND ENFORCE POLICIES AND PROCEDURES MANDATED BY THE TEXAS COMMISSION JAIL STANDARDS FOR APPROPRIATE MEDICAL CARE INCLUDING MENTAL HEALTH AND ACUTE AND EMERGENCY SITUATIONS

### A. Nueces County, Texas Contracted with Correct Care Solutions, which Later Became Wellpath, for Nueces County Inmate Medical Care

122. On December 1, 2015, the Nueces County Commissioners Court and Nueces County Judge entered into a Heath Services Agreement with Correct Care Solutions for Medical Services for Inmates at Jail Facilities and Residents at the Juvenile Center. (Nueces County, RFP No. 2993-15).

123. CCS took over Nueces County Jail inmate care services on or about December 1, 2015.  Nueces County Commissioners, Nueces County Judge and former Nueces County Sheriff Kaelin actively participated in the investigation, selection and negotiation process awarding CCS the contract. The Health Services Agreement specifically provided for the delivery of reasonable and necessary medical, mental health, nursing, dental care, and related supporting services to all inmates at the Nueces County Jail facilities, including work release inmates, in the custody of the County Sheriff, and to provide for the medical and mental screening of all persons brought to the facilities for booking.

### B. Health Services Agreement is a policy of Nueces County, Texas and Wellpath which is inadequate to address inmate mental health, medical care and acute and emergency health situations

124. Section 1.2 of the Health Services Agreement states:

1.2 Scope of General Services. The responsibility of CCS to deliver reasonably necessary health care services to an inmate commences with the physical placement of an inmate into the Facilities, which is considered the official booking. CCS shall provide health care services for all inmates, including Work Release Inmates. CCS shall provide, twenty four (24) hours a day, seven (7) days a week, at full staffing, all professional medical, dental, mental health, and nursing, allied health, administrative, and support services as described in Appendix A. CCS's services shall include but are not limited to (i) intake medical and mental health assessments, health care services for chronic, infirmary, and sick call care, routine and preventive care, including health assessments, and acute and emergency care; (ii) laboratory, radiology, pharmacy, physical therapy, and other supporting ancillary services and supplies; (iii) other related non-ancillary support services; and (iv) related technical and administrative services for all inmates under the custody and control of the County Sheriff at the Facilities.

CCS shall provide the services specified herein, which shall constitute reasonable health care services in accordance with the standards and/or requirements promulgated by (i) the National Commission on Correctional Health Care relating to health services in jails (hereinafter referred to as the "NCCHC"); (ii) the American Correctional Association relating to health services (hereinafter referred to as the "ACA"), and (iii) Texas Administrative Code Title 37, Part 9, Chapter 273, (the Texas Commission on Jail Standards related to health services) and any other applicable state and federal statutes, including any other applicable Order of a Court.

125. Nueces County, Texas retained control over CCS' employees, later Wellpath's

employees, in Section 2.4 of the Health Services Agreement:

2.4 County's Satisfaction with HealthCare Personnel. If County should become dissatisfied with any health care personnel provided by CCS, County will give written notice to CCS of its reasons for dissatisfaction, except as noted in Article 2.4(A), below. CCS agrees to cooperate with the County Sheriff and respond to inquiries or complaints about its personnel, including lack thereof, or contractors in a timely manner, should the County Sheriff have security or other concerns about CCS's employee's and/or contractors' fitness or ability to perform at the Facilities. CCS will exercise its best efforts to resolve the problem or other concerns, including lack of personnel. And, if the problem involving fitness or ability is not resolved, CCS will remove

the individual according to CCS's personnel policy or independent contractor agreement.

A. All CCS personnel, subcontractors, and agents shall meet minimum standards as determined by the County prior to receiving a security clearance to enter the Facilities. If, at any time during the course of their employment or contract engagement, any CCS employee or subcontractor engages in conduct (either on or off duty) which threatens the security of the Facilities or would otherwise render that person ineligible for a security clearance, notwithstanding any other provision of this Agreement, County reserves the right to withdraw that person's security clearance and shall immediately notify CCS.

B. Initial and continued assignment of staff and subcontractors by CCS shall be subject to approval of the County. All persons employed by CCS or its subcontractors shall not be deemed to be the employees of County by reason of any provision of this Agreement.

C. CCS shall continuously maintain personnel files (or copies thereof) of all employees assigned to the Facilities.

126. The staffing plan under the Health Services Agreement included attachments which identified the specific staffing required and agreed by both parties as acceptable levels.   The Health Services Agreement is detailed as to specify the position, days of the week, shift and number of hours that each Wellpath position would work at the Nueces County Jail.

127. The Health Services Agreement between Nueces County, Texas and Wellpath represents the official policy of both of these entities as it was negotiated and signed by the final policymaking officials representing Nueces County, Texas, the Nueces County Judge, and Wellpath LLC, CEO, each agreed to and entered into the contractual terms.

128. Defendant Nueces County, Texas and Defendant Wellpath maintained a policy of not having an appropriate level of medical staff on duty to handle acute and emergency medical situations; not including an on-duty jail supervisory staff with authority to transfer an inmate to a medical facility and a policy of inadequate monitoring of pretrial detainees which amounted to a denial of medical care. Also, Defendants Nueces County and Defendant Wellpath maintained a policy of failing to provide training to employees to recognize when and how adequate medical care should be administered to inmates such as Mr. Johnson.  The Health Services Agreement omitted training of employees related to inmate healthcare, but it did contain a provision related to privacy and security training – supporting that healthcare was intentionally omitted by the parties. These policies are supported by the terms of the Health Services Agreement and its amendments entered into by the final decisionmakers for the parties.

129. In reviewing this information and considering the adequacy of the staffing, it is important to keep in mind that Former Nueces County Judge Sam Neal, Jr. stated that "we have about 900 prisoners in our jails and statistics say that 20 to 25 percent of jail inmates have mental problems."   This means that, on average, between 180 to 225 Nueces County Jail inmates at any given time are incarcerated and need mental health and medical care.  This number does not consider non-mental health care. Also, many of the inmates with mental health problems are incarcerated specifically because they are experiencing mental problems and need to see a physician and psychiatrist.

## C. Staffing Plan is inadequate to meet inmate mental health and medical care needs

130. The Staffing Plan attached and incorporated into the Health Services Agreement reads:

# Staffing Plan

## Adult Facilities

| CCS Proposed Staffing – Nueces County Jail and McKinzie Annex | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | |
| **Position** | **Mon** | **Tue** | **Wed** | **Thu** | **Fri** | **Sat** | **Sun** | **Hrs/Wk** | **FTE** |
| Physician/Medical Director | | 4 | | 4 | | | | 8 | 0.20 |
| Mid-level Provider | 8 | 8 | 8 | 8 | 8 | | | 40 | 1.00 |
| Health Services Administrator | 8 | 8 | 8 | 8 | 8 | | | 40 | 1.00 |
| Director of Nursing | 8 | 8 | 8 | 8 | 8 | | | 40 | 1.00 |
| Charge/Booking RN | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 56 | 1.40 |
| LVN – Med Pass | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 168 | 4.20 |
| LVN – Annex | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 56 | 1.40 |
| Administrative Assistant | 8 | 8 | 8 | 8 | 8 | | | 40 | 1.00 |
| Medical Records Clerk | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 56 | 1.40 |
| Dentist | 8 | | 8 | | | | | 16 | 0.40 |
| Dental Assistant | 8 | | 8 | | | | | 16 | 0.40 |
| Psychiatrist | | 5 | | | | | | 5 | 0.125 |
| Mental Health Nurse Practitioner | | 8 | | | | | | 8 | 0.20 |
| Mental Health Professional/MSW | 12 | 12 | 12 | 12 | 12 | | | 60 | 1.50 |
| **Total Hours/FTE – Day** | | | | | | | | **589** | **15.225** |
| **Evening Shift** | | | | | | | | | |
| Charge/Booking RN | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 56 | 1.40 |
| LVN – Med Pass | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 112 | 2.80 |
| LVN – Annex | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 56 | 1.40 |
| **Total Hours/FTE – Evening** | | | | | | | | **224** | **5.60** |
| **Night Shift** | | | | | | | | | |
| Charge/Booking RN | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 56 | 1.40 |
| LVN – Med Pass | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 112 | 2.80 |
| LVN – Annex | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 56 | 1.40 |
| **Total Hours/FTE – Night** | | | | | | | | **224** | **5.60** |
| **Weekly Total** | | | | | | | | | |
| **Total Hours/FTE per week** | | | | | | | | **1,037** | **26.425** |

131.   The Staffing Plan only provides for a Physician/Medical Director for 4 hours on Tuesdays and Thursdays; a Psychiatrist for 5 hours on Tuesdays; and a Mental Health Nurse Practitioner for 8 hours on Tuesdays.   This staffing level is clearly insufficient to provide adequate medical and mental health care to the Nueces County Jail inmate population, including Mr. Johnson. The policy of understaffing for these positions is a moving force behind the constitutional deprivations by Defendant Nueces County, Texas and Defendant Wellpath LLC under 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

### D. Compensation is inadequate to meet inmate mental health and medical care needs

132. The compensation under the Health Services Agreement paid by Nueces County, Texas to CSS, later Wellpath LLC, is:

• Initial Three-Year Agreement Term (three [3] years beginning December 1, 2015 through November 30, 2018): $9,547,446 to be paid in equal monthly installments of $265,206.83.

• Optional Year Four Term (one [1] year beginning December 1, 2018 and ending November 30, 2019): $3,339,556 to be paid in equal monthly installments of $278,296.33.

• Optional Year Five Term (one [1] year beginning December 1, 2019 and ending November 30, 2020): $3,504,484 to be paid in equal monthly installments of $292,040.33.

Both Defendant Nueces County, Texas and Defendant Wellpath LLC knew that these rates are inadequate to pay for necessary mental health and medical care for the inmate

population of the Nueces County Jail. Further, Wellpath LLC has a policy, practice and custom of not providing higher levels of medical and mental health care in order to maximize their profits. This policy, practice and custom is a moving force behind the constitutional deprivations by Defendant Nueces County, Texas and Defendant Wellpath LLC under 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

### E. Amendments to Health Services Agreement

133. Amendment No. 1 to the Health Services Agreement was entered into on August 22, 2018 and it provided that the parties mutually agree: (1) To exercise the renewal option of one (1) year as set out in Article 7.1 of the Agreement extending the termination date of the Agreement to November 30, 2019. (2.) All other provisions of Agreement shall remain the same. (Nueces County, RFP No. 2993-15).

134. Amendment No. 2 to the Health Services Agreement was entered into on March 27, 2019 and it provided that the parties mutually agree: (1.) Any reference to Correct Care Solutions, LLC will now be changed to Wellpath LLC.; and (2.) All other provisions of Agreement shall remain the same. (Nueces County, RFP No. 2993-15).

135. Amendment No. 3 to the Health Services Agreement was entered into on or about December 4, 2019 and it provided that the parties mutually agree: (1) To exercise the renewal option of one (1) year as set out in Article 7.1 of the Agreement extending the

termination date of the Agreement to November 30, 2020; and (2) All other provisions of Agreement shall remain the same.

## F. Wellpath's History of Inadequate Medical Care

136. According to an article, <u>Please Help Me Before it is Too Late</u>, by Blake Ellis and Melanie Hicken, CNN, Published June 25, 2019, "after being acquired by a multibillion-dollar private equity firm and combined with a smaller competitor, Wellpath is the nation's largest for-profit provider of health care to correctional facilities. The company has won government contracts that span more than 500 facilities in 34 states. It promises to provide better services than its competitors and to save agencies money while doing it. But internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50 current and former employees and scathing correspondence from government clients show that amid a focus on "cost containment" and massive corporate growth, the company has provided substandard care that has led to deaths and other serious outcomes that could have been avoided. CNN's investigation looked at complaints and problems at nearly 120 locations in 32 states."

137. The CNN article also reports, "Based in Nashville, the company oversees the medical treatment of inmates at facilities including small county jails, sprawling state prisons and juvenile and immigrant detention centers. It is responsible for around 300,000 people in custody every day, including more than 6,000 juveniles, and it is projected to bring in $1.5 billion in annual revenue."

138. Before the Nueces County Commissioners and Nueces County Judge decided to extend the Health Services Agreement and prior to each renewal and amendment, each knew or had reasonable available to them that CCS, later Wellpath, is known to provide constitutionally inadequate medical care. A few examples of publicly available information about CCS' and Wellpath's constitutionally inadequate medical care are:

a. lawsuits filed between 2014 and 2018 found that CCS, now Wellpath, has been accused of contributing to more than 70 deaths.

b. According to an article, The Private Option, written by Marsha McLeod and published in The Atlantic on September 12, 2019, Wellpath's predecessor, Correct Care Solutions, had been sued at least 1,395 times in federal courts over the past decade citing a document published by the Project on Government Oversight.

c. "Please help me before its to(o) late," wrote 60-year-old Henry Clay Stewart from the Hampton Roads Regional Jail in Virginia in 2016 to CSS. Stewart reported abdominal pain, blackouts and an inability to keep down food or water. He asked to see a doctor or nurse "ASAP" and begged to be sent to the emergency room. Mr. Stewart died on August 6, 2016, of what later was found to be bleeding from a perforated stomach ulcer.

d. "Help, I am very sick," wrote Jeff Lillis to CSS who was booked into Colorado's Arapahoe County jail in 2014. The 37-year-old, who had a history of drug- and theft-related charges, was never seen by a doctor. He died in a pool of blood and vomit. An autopsy showed he died of sepsis after a case of pneumonia became so severe that his left lung nearly doubled in weight from the infection.

e. In a March 25, 2016 communication, Pierce County, Washington, Office of the Prosecuting Attorney, wrote that it terminated its contract with CSS after less than two years called the company's performance "morally reprehensible and left the County open to lawsuits." The letter was to both CSS and Conmed.   CCS acquired Conmed in 2012.

f. In a May 23, 2018 communication, Clarke County Washington Sheriff's Office, Commander Mike Anderson wrote:

> As you know I have been transitioning some of my duties to Cmdr. Kimberly Beltran due to my retirement.  Cmdr. Beltran and I have been meeting with ▮▮▮▮▮▮▮▮▮ to insure a smooth transition of duties.  Several months ago we had discussions regarding the mental health services CCS was providing.  My analogy from our previous discussions was CCS has always referred to Clark County as their flag ship on the west coast.  During our discussions I communicated to you that your flag ship was taking on water and in danger of sinking.  This is directly related to CCS's inability to staff and provide mental health services from 1/12/18 as required by the contract.

g. In a March 2, 2016 email, Charles Adams, the Jail Administrator of Collin County, Texas wrote about CSS:

Charles Adams, Jail Administrator:

"During the RFP process we expressed our desire to completely revamp our mental health program. They met this request completely.  Before Southwest we had a list of 80 inmates waiting to see the psychiatrist.  Now we don't have a waiting list.  Most inmates are seen with 48 to 72 hours and sometimes the same day as the request or referral is made.

In most cases the dentist sees inmates the next day after the request is submitted.  With the old company (Correct Care Solutions- CCS) the inmates had to wait up to two weeks the see the dentist.

Inmate complaints have almost stopped.  And most to the complaints that we receive, are found to be unfounded.

Offsite cost have been reduced.

I find that SWCMG's Medical Staff to be friendly, cooperative and helpful. They appear to be very Group considers the inmate care needs first and then cost second. They keep cost down by providing as much care as the can on site and reduce off site visits.

If you have any questions, please let me know."

Sincerely,

Charles A. Adams

h. In a 2015 report from the New York State Commission of Corrections, "McNulty's complaints of chest pain were mismanaged by nursing staff from [CSS], resulting in a 90 minute delay in receiving physician ordered treatment…had McNulty been given appropriate emergency medical care and sent to a hospital in a timely manner his death may have been prevented."

i. In 2016, a jail sergeant in Illinois told investigators that she was about to call an ambulance for 59-year-old Paul Clifton Jr., who had been having difficulty breathing, when CCS employees said his condition had improved

and that it was unnecessary to send him out. His blood pressure remained dangerously high and he complained of chest pains, but an ambulance still wasn't called until he was unresponsive. The man died around 32 hours after entering the jail.

j. An autopsy report determined that the 2013 death of a 37-year-old woman housed in the City of Las Vegas Detention Center was a "Medical Diagnostic Misadventure or Avoidable Accident." The report said she died from a severe complication of diabetes, calling it an "expected and foreseeable risk" and stating a diabetes diagnosis should have been made. CCS said in a court filing that there was no evidence its employees actually knew the woman had diabetes, but the medical examiner said in a deposition that he reviewed CCS records that included this fact.

k. A coroner's report stated that a 38-year-old man committed to the Columbia Regional Care Center, a South Carolina psychiatric facility, died in 2017 of "acute mixed drug toxicity" after records show CCS employees had given him a dangerous cocktail of drugs. The "level of medications" found in his system, according to the coroner's report, "would cause death." CCS said in court documents that its employees "exercised that degree of skill and care required of them by law at all times."

l. A judge in Tennessee released inmates from the Silverdale Detention Center who he believed were not receiving adequate treatment from CCS. This included a man who said his cancer wasn't being treated and that he was only receiving Tylenol for an injury that left a bone protruding from his shoulder. "I think the medical care that you've been receiving at Silverdale, for reasons I don't understand, is inexcusable," the judge told the inmate in court in 2017, according to a transcript. CoreCivic, which operates the jail, didn't comment on specifics but said it "is committed to providing high-quality healthcare to those entrusted to our care."

n. In a deposition in a South Carolina lawsuit, a CCS medical director at Richland County's Alvin S. Glenn Detention Center, where employees waited days to send a badly-injured inmate to the emergency room, said in 2014 that the company made it clear that employees who "run up the tab" wouldn't be around very long. He said there was pressure on him from both the county and CCS to limit emergency room transfers because of the "severe expense" involved -- regardless of who had to foot the bill. The company said there was no reason for physicians to feel this kind of pressure, since it purposely does not share details of financial arrangements with providers. It also said that the majority of its nearly 15,000 employees do not feel this

way. The county didn't comment on the doctor's statement but said "detention center employees follow medical instructions from the facility's medical providers."

o. After inspecting an immigrant detention center in Adelanto, California, where CCS was the provider, a Department of Homeland Security watchdog found that detainees did not "have timely access to proper medical care." According to the September 2018 report, detainees said they had not been seen for months or received their medications and doctors were indicating they had seen patients they didn't actually visit. US Immigration and Customs Enforcement, which oversees the facility, said at the time that it takes the findings seriously and would be conducting a review to ensure standards are now being met.

p. Within a period of 24 days in May 2017, two men died in Forsyth County Georgia's jail. Deshawn Lamont Coley had made written requests begging for his asthma inhaler and Correct Care Services failed to get him medical treatment. However, those requests were denied and he died from complications from asthma. The second, Stephen Antwan Patterson, was found without a pulse about a week after he was booked and Correct Care Services failed to treat his high blood-pressure. Previously, two legal settlements were reached—one for $180,000, and the other for an undisclosed amount, about six months earlier, according to the Triad City Beat—in the deaths of two other inmates, Dino Vann Nixon in 2013 and Jennifer McCormack Schuler in 2014. Diane Nixon filed a lawsuit on July 31, 2015, in Forsyth Superior Court against Correct Care Solutions LLC, the jail's medical provider, several Correct Care employees and Forsyth County officials, including Sheriff Bill Schatzman. The lawsuit alleged that the jail's medical doctors and nurses neglected the worsening physical condition of Nixon's husband, Dino Vann Nixon, resulting in his death.

q. In March 2015, Jennifer Lobato, 38, was suffering from heroin withdrawal when she was booked into the Jefferson County jail in Golden, Colorado for shoplifting. Though vomiting profusely, she was told she wouldn't receive treatment until she cleaned up the mess she had made. About 20 minutes after her requests for medical care were ignored, her cellmate noticed she was no longer breathing. Ms. Lobato died of an easily-treatable electrolyte imbalance. Her family filed a lawsuit that named CCS, the jail's privately-contracted medical provider, as a defendant.

139. The Nueces County Commissioners and Nueces County Judge decided to renew the Health Services Agreement and each knew facts which support that CCS was providing constitutionally inadequate medical care at the Nueces County Jail. In addition to examples cited throughout this complaint, the following are additional examples:

a. From the time that CCS took over the Heath Services Agreement in December 2015 until the time of Mr. Johnson's death, the Nueces County Jail experienced a higher level of deaths than in preceding years. These deaths totaled 9 in less than a 32 month period and the inmates who died in custody during this time are:

| Decedent Inmate | Date of Death | Report of Post Mortem Examination Status on Custodial Death Report |
|---|---|---|
| Gregg O. Dentler | 04/21/2016 | Pending |
| Santos Mungia | 06/20/2016 | Pending |
| Tami R. Bond | 02/07/2017 | Pending |
| Gabriel Murrieta | 04/20/2017 | Pending |
| Gabriel Trevino | 12/05/2017 | Pending |
| Cristobal Flores | 09/20/2017 | Pending |
| Danny Carrillo | 03/05/2018 | Yes |
| David L. Gomez | 07/25/2018 | Pending |
| David Johnson | 12/15/2018 | Yes, but not properly reported |

Of these 9 deaths, 7 of the deaths did not reveal the results of an autopsy on the Custodial Death Report and merely recited that the results were pending.

b. On 12/5/2017 at approximately 0035 hours, Officer Austin Wood conducted a security check of the Infirmary (Unit 3R) of the Nueces County Jail. When he checked on Cell #5, Officer Wood observed Inmate Gabriel Trevino, a 32 year old male, kneeling adjacent to his bed with his head face down on the mattress. Officer Wood knocked on the cell door several times, but Inmate Trevino did not respond. Officer Wood called a Signal 35U (Inmate Down -Unknown) via radio. Security and Medical staff arrived at approximately 0043 hours. Medical personnel began chest compression after they were unable to find a pulse. 911 was contacted, and paramedics arrived on scene at approximately 0052 hours and began to administer aid but were

unsuccessful. At approximately 0113 hours, Inmate Trevino was pronounced dead from hospital staff via telephone. Paramedics departed for the hospital with Inmate Trevino at approximately 0135 hours. Medical cause of death unknown/pending.

c. On March 5, 2018, Danny Carrillo, died of a heart attack after Nueces County Jailers used a stun gun on him.  Mr. Carrillo had mental problems which included schizophrenia, major depression, anxiety disorder, and bipolar disease for which he did not receive adequate medical care which resulted in his death. A lawsuit is pending styled *Armando Carrillo v. Oliver Buendia*, et al In the Southern District of Texas, Corpus Christi Division, Civil Action No: 2:20-cv-00028.   Nueces County is a defendant in this lawsuit.

d. In or about June 2018, Nueces County Jail inmate, Patrick Durkin, was experiencing psychiatric problems while in the Nueces County Jail.   While in custody, Mr. Durkin had his hands handcuffed and he was taken to a suicide watch cell that is has a blind spot and the area is not visible on camera. Mr. Durkin was thrown on the ground resulting in his rib being broken. Defendant Zapata participated in the injury to Mr. Durkin. Nueces County failed to adequately treat Mr. Durkin for his mental health condition and broken ribs.

e. On July 25, 2018 at 11:04 hours, unit officer checked on subject. David L. Gomez was unresponsive. Officer called for assistance, medical staff arrived and attempted to revive subject. EMS was contacted and arrived at 11:12 hours. EMS was unsuccessful and subject was declared deceased at 11:20 hours. The Medical Examiner's office and Texas Rangers were notified to perform a custodial death investigation. Mr. Gomez was 65 at the time of death.   Mr. Gomez had mental health problems.   The Custodial Death Report was filed on August 10, 2018 and states that the coroner results are pending.

140.   The Nueces County Commissioners Court, the Nueces County Judge, former Nueces County Sheriff Kaelin Defendant Sheriff Hooper and Wellpath LLC were aware that Wellpath LLC, formerly CCS, provided grossly deficient medical care in the past and that Wellpath could not provide competent medical and mental health care to Nueces

County Jail inmates at the rates under the Health Services Agreement and that the staffing identified in that Agreement was inadequate. Despite this knowledge, the Nueces County Commissioners Court, the Nueces County Judge, former Nueces County Sheriff Kaelin, Defendant Sheriff Hooper and Wellpath LLC adopted a policy, practice and custom of entrusting and accepting treatment of inmate's serious medical and mental health conditions to Wellpath LLC who employed insufficient numbers of medical and mental health providers and provided this care in greatly insufficient dates and times to the inmate population of the Nueces County Jail to meet their adequate medical and mental health care needs.

141. Defendants Nueces County, Texas, former Nueces County Sheriff Kaelin, Defendant Sheriff Hooper, individually, and Wellpath LLC failed to properly and adequately have and enforce policies and procedures mandated by the Texas Commission on Jail Standards. Those state rules require jails to implement "procedures for efficient and prompt care for acute and emergency situations." 37 Tex. Admin. Code § 273.2. Defendant Nueces County, Texas, through the Nueces County Commissioners Court and Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, individually, selected and/or retained Wellpath LLC for the purpose of providing mental health and medical care to the Nueces County Jail inmates. However, these final policymaking officials knew that the Health Services Agreement with Wellpath LLC was inadequate to provide adequate mental health and medical care because it was not specific as to the requirements, policies and needs of inmates with mental health conditions and

medical problems and it did not provide adequate funding, staffing, services, including outpatient, acute and emergency care for inmates.    Further, the Health Services Agreement provided an incentive for Wellpath LLC not to provide adequate mental health and medical care to inmates because of the method of compensation would provide a higher margin of profit for Wellpath LLC by withholding services to inmates. Although Mr. Johnson had a mental health condition, he neither saw a psychiatrist, physician nor had been provided with appropriate housing and care for his mental health conditions.    Further, Mr. Johnson had cried for help, was bleeding from his head and could not stand, there was inadequate medical care provided to him for his acute and emergency medical needs. Weak and unable to stand, with his hands handcuffed behind his back, Mr. Johnson was simply returned to his cell. Within a few hours, the injuries caused by the assaults by Defendants Zapata, Fielder and Culp and the failure to provide adequate medical care for those injuries lead to Mr. Johnson's death. **Plead alternatively under FRCP 8, if Mr. Johnson did in fact have bronchopneumonia, bilateral, Defendants Zapata, Culp, Fielder, Nueces County, Texas, Wellpath LLC, Peeler, Bocanegra, Roberson, and Flint failed to provide him with adequate medical care for this medical condition resulting in his death.** The failure to provide adequate mental health care and medical care and to have policies and procedures for efficient and prompt care for acute and emergency situations supports that Defendant Nueces County, Texas, Defendant Sheriff Hooper, individually, and Wellpath had little regard for the medical standards imposed by the state. The inadequate mental health care and medical care for the injuries caused by the assaults resulted in Mr. Johnson's death.

The policies, customs and practices of Nueces County, Texas, Defendant Sheriff Hooper and Wellpath were moving forces behind Mr. Johnson's constitutional deprivation under 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement-Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts).

142.   Mr. Johnson's case is not the first time that the Nueces County Jailed failed to provide adequate medical care to an inmate which supports that Nueces County Jail has a policy, longstanding practice and custom of failing to properly and adequately have and enforce policies and procedures mandated by the Texas Commission on Jail Standards for acute and emergency medical care. In a lawsuit, *Adam A. Balle v. City of Corpus Christi, et al*, Civil Action 2:14-cv-00066, In the United States District Court, Southern District of Texas, Corpus Christi Division, Mr. Balle sued Nueces County, Texas in federal court for constitutional violations. Mr. Balle's amended complaint alleged that Nueces County failed "to properly and adequately enforce policies and procedures mandated by the Texas Commission on Jail Standards." *Balle v. Nueces County, Texas*, 952 F.3d 552, 559 (Cir. 2017).   Those state rules require jails to implement "procedures for efficient and prompt care for acute and emergency situations." 37 Tex. Admin. Code § 273.2. *Id*. The United States Fifth Circuit Court of Appeals in reviewing a Motion to Dismiss on appeal noted that Mr. Balle's allegations regarding the consistently slow and inefficient medical care he received suggest that Nueces County had little regard for the medical standards imposed by the state. *Id*. According to the amended complaint, when Mr. Balle soiled himself and

was unable to clean himself, jail personnel merely took him to the showers and gave him a change of clothes. No medical attention was provided at that time. *Id* at 560. The complaint also indicates that when Mr. Balle subsequently complained he was unable to control his bodily functions and was experiencing severe muscle spasms, he was not given medical attention until the following day. *Id*. Even then, Mr. Balle was allegedly "[c]hecked" and "cleared" by medical staff, and no further action was taken. *Id*. Finally, the complaint states that when Mr. Balle complained that he was paralyzed and unable to walk, medical staff "checked and cleared" him once again and simply reported that Balle was "refusing to move." *Id*.   The Fifth Circuit found that the complaint in specific terms alleges that jail personnel did not provide Mr. Balle with even minimally adequate medical care for his acute and emergency needs and made little effort to transfer him to a hospital, despite his numerous complaints that he was experiencing a medical emergency. *Id*. This pattern of failures defied state law requiring that Nueces County implement procedures to efficiently and promptly treat inmates during "acute and emergency situations." *Id*. Reasonable inferences can clearly be drawn that Nueces County had an unwritten policy or a widespread practice that fairly represents municipal policy of consistent noncompliance with required state medical standards and that this policy or practice of noncompliance was the moving force behind the unconstitutional injuries—the Eighth Amendment violations—inflicted upon Mr. Balle. *Id*. The amended complaint pleaded facts sufficient to support a municipal liability claim that is plausible on its face. *Id*. The Fifth Circuit held

that the district court erred in dismissing Balle's claims against Nueces County under Rule 12(b)(6). *Id*.

143. Similarly to Mr. Balle's case and the others cited, Mr. Johnson has stated facts in this complaint in specific terms that jail personnel did not provide him with adequate mental health and medical care for his acute and emergency needs, despite his yelling for help, finding a wound on his head with blood, and his inability to stand on his own because he was too weak. Plead alternatively under FRP 8, if Mr. Johnson had **acute bronchopneumonia, bilateral, there is no evidence that jail personnel provided him with adequate care**. This pattern of failures defied state law requiring that Nueces County and Wellpath to implement procedures to efficiently and promptly treat inmates during "acute and emergency situations." Reasonable inferences can clearly be drawn that Nueces County and Wellpath had an unwritten policy or a widespread practice that fairly represents municipal policy of consistent noncompliance with required state medical standards and that this policy or practice of noncompliance was the moving force behind the unconstitutional injuries—the Fourteenth Amendment violations—inflicted upon Mr. Johnson.

**X. NUECES COUNTY JAIL AND WELLPATH'S POLICY,**
**LONGSTANDING PRACTICE AND CUSTOM OF NOT**
**ACCURATELY COMPLETING CUSTODIAL DEATH REPORTS**
**FILED WITH THE ATTORNEY GENERAL OF TEXAS AND NOT**
**COOPERATING WITH OUTSIDE INVESTIGATIONS IS A**
**MOVING FORCE BEHIND CONSTITUTIONAL DEPRIVATIONS**

144. From April 21, 2016 through August 6, 2020, the Nueces County Sheriff's

Office reported to the Attorney General of Texas, in 13 custodial deaths, an autopsy was

pending in 9 of the cases when the report was filed.

| Inmate Decedent | Date of Death | Report of Post Mortem Examination Status on Custodial Death Report |
|---|---|---|
| Gregg O. Dentler | 04/21/2016 | Pending |
| Santos Mungia | 06/20/2016 | Pending |
| Tami R. Bond | 02/07/2017 | Pending |
| Gabriel Murrieta | 04/20/2017 | Pending |
| Gabriel Trevino | 12/05/2017 | Pending |
| Cristobal Flores | 09/20/2017 | Pending |
| Danny Carrillo | 03/05/2018 | Yes |
| David L. Gomez | 07/25/2018 | Pending |
| David Johnson | 12/15/2018 | Yes |
| Anthony Thompson | 09/04/2019 | Yes |
| Maria I. Cabrera | 02/06/2020 | Yes |
| Mohammed Sahi | 04/26/2020 | Pending |
| Theodore Allen | 08/06/2020 | Pending |

145. In Mr. Johnson's case when the autopsy was completed by December 17, 2018,

the Custodial Death Report was not filed until January 23, 2019 and the report stated,

"Medical Cause of Death: Pending Autopsy."  This was not true as the Report of Post

Mortem Examination was completed on December 17, 2018 and the report determined that

Mr. Johnson's manner of death was natural and the cause of death was acute

bronchopneumonia, bilateral. The Nueces County Sheriff's Office filed 4 different Custodial Death Reports for Mr. Johnson with the Attorney General of Texas.  The fact that the Nueces County Sheriff's Office is not accurate and intentionally withholding clearly known information about the cause of death from the Post Mortem Examination conducted by the Nueces County Medical Examiner in their reports of custodial deaths to the Attorney General of Texas is aimed at covering-up and not reporting the true cause of inmate deaths.

146. The Nueces County Jail and Wellpath have a policy, longstanding practice and custom of not accurately completing custodial death reports filed with the Attorney General of Texas which show a deliberately indifferent attitude towards official misconduct.  This policy, practice and custom is a moving force in the constitutional deprivation of inmate rights relative to violation of an inmate's constitutional rights, including Mr. Johnson's rights, in violation of §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement - Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts) because it is part of a cover-up of these violations which allows the constitutional violations to be condoned and continue.

147. The Nueces County Jail has a policy, longstanding practice of responding to outside investigators investigating Nueces County Jail inmate excessive force claims, assault claims and/or deaths by providing inaccurate and/or omitting relevant information

to outside investigators leading to inadequate investigations and findings calculated to mislead the public and other law enforcement authorities and which show a deliberately indifferent attitude towards official misconduct. This policy, practice and custom is a moving force in the constitutional deprivation of inmate rights relative to violation of an inmate's constitutional rights, including Mr. Johnson's rights, in violation of §1983 - Fourteenth Amendment (Excessive Force - Pretrial Detainee); 42 U.S.C. §1983 - Fourteenth Amendment (Bodily Integrity); 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement -Pretrial Detainee); and 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care - Pretrial Detainee/Episodic Acts) because it is part of a cover-up of these violations which allows the constitutional violations to be condoned and continue.

## XI.   CAUSES OF ACTION

### A.   42 U.S.C. §1983 - Fourteenth Amendment –
### Excessive Force- Pretrial Detainees[18]

#### 1. Background

148. Plaintiff incorporates by reference the allegations set-out in paragraphs 1 - 75 of this Complaint as if fully set-out herein.

149. Plaintiff pleads this claim in the alternative as allowed under FRCP 8 to the extent the facts of this claim and his other claims in this lawsuit are inconsistent.

---

[18] *See* Fifth Circuit Pattern Jury 10.7B

150. Plaintiff brings claims for violations of his rights under 42 U.S.C. §1983 and the Fourteenth Amendment (Excessive Force) — Pretrial Detainees against the following Defendants:

> Employees of Nueces County, Texas who are individual defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity

> Individual Defendant Policymaker and Supervisor who is an individual defendant acting under color of state law for purposes of 42 U.S.C. § 1983: John Chris Hooper, Nueces County Sheriff, in his individual capacity

> Defendant Municipality: Nueces County, Texas

151.   Section 1983 of the Civil Rights of 1871, 42 U.S.C. § 1983, prohibits any person acting under color of state law from depriving any citizen or person of the rights, privileges and immunities secured by the Constitution.

152. Pretrial detainees, such as Mr. Johnson at the time of the events made the basis of this lawsuit, are protected from excessive force by the Due Process Clause of the Fourteenth Amendment. *Cupit v. Jones*, 835 F.2d 82, 84–85 (5th Cir. 1987). The United States Supreme Court clearly established the law in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015), "that a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."

153.   At the time of the actions made the basis of this lawsuit, Mr. Johnson clearly had rights under the Fourteenth Amendment to the United States Constitution from excessive force from the acts of those "acting under color of state law."   At issue in this

case are the assaults by Defendants Zapata, Fielder and Culp which caused serious bodily injury to Mr. Johnson ultimately leading to his death.

## 2. Claims against Individual Defendants Zapata, Fielder and Culp

154. The assaults, actions and force purposely or knowingly used against Mr. Johnson by Defendants Zapata, Fielder, and Culp, individually, were objectively unreasonable as set out specifically in paragraphs 33-66 herein and their actions and inactions were the proximate cause of Mr. Johnson's injuries and death. These Defendants do not have qualified immunity because the law related to excessive force under the Fourteenth Amendment was clearly established at the time of the events made the basis of this lawsuit.

155. The actions of Defendants Zapata, Fielder and Culp, individually, are acts under color of state law as they were correctional officers employed by Nueces County, Texas and assigned to work at the Nueces County Jail.

156. Mr. Johnson did nothing to invite or in any other manner give any legal justification for the assaults and violations of excessive force that are raised in this lawsuit. Defendants, Zapata, Fielder, Culp, intentionally assaulted Mr. Johnson without legal justification causing him serious bodily injury ultimately resulting in death. The force each used on Mr. Johnson was objectively unreasonable and a reasonable officer possessing Defendants, Zapata, Fielder, Culp's knowledge of the circumstances at the scene would have viewed the force and assault as unreasonable or excessive.

### 3. Claims against Defendant Nueces County, Texas[19]

157. Plaintiff claims that Defendant Nueces County, Texas violated his Fourteenth Amendment right to be protected from excessive and unnecessary force and impermissible punishment.

158. The Fourteenth Amendment to the Constitution of the United States protects pretrial detainees like Plaintiff from punishment, including excessive and unnecessary force and impermissible punishment because Mr. Johnson had not been convicted.

159. A county is not liable for the actions of its employees unless the constitutional violation was caused by a county's policy or custom.

160. Plaintiff has plead detailed facts in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which support:

> a. Official policies, longstanding practices and/or customs existed for Nueces County, Texas, which were implemented by the final policymaking officials for Nueces County, Texas who are the Nueces County Commissioners Court and the Nueces County Judge. Official policies, longstanding practices and/or customs existed for the Nueces County, Texas Jail which were implemented by the final policymaking officials for the Nueces County Jail who are former Nueces County Sheriff Jim Kaelin and

---

[19] Texas Pattern Jury Charge 10.5

Defendant Sheriff Hooper.

b. policymakers for Nueces County, Texas, specifically, the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper, knew or should have known about the policies and/or customs identified herein;

c. the policymakers, the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, were deliberately indifferent; and

d. the policies and/or customs were the moving force leading to the constitutional violation being the excessive force used against Mr. Johnson causing him injury and death.

161. Plaintiff has also plead facts that support:

the training and hiring procedures of the municipality's policymaker were inadequate,

the municipality's policymakers were deliberately indifferent in adopting the hiring or training policy, and

the inadequate hiring or training policy directly caused the plaintiff's injury.

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).

162. A "policy" can be a policy statement, ordinance, regulation, or decision officially adopted and promulgated by Nueces County's officers, in this case, Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper.

163. A "custom" is a persistent, widespread practice of Nueces County, Texas' officials or employees that, although not formally adopted, is so common and well-settled that it fairly represents Nueces County, Texas' policy. Nueces County

Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, established the longstanding practices and customs for the Nueces County Jail made the basis of this lawsuit which have been specifically plead in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

164.   Nueces County, Texas' final policy making officials for the Nueces County Jail, Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper knew or should have known about the customs set-out in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

165. A local government entity violates §1983 where its official policy or custom serves to deprive an individual of his or her constitutional rights. *Monell*, 436 U.S. at 692-

94. A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id*. Where the identified policy is itself facially lawful, the plaintiff "must demonstrate the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) *citing City of Canton*, 489 U.S. at 388. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Brown, 520 U.S. at 410, 117 S.Ct. 1382. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *City of Canton*, 489 U.S. at 383, 388. In the present case, Mr. Johnson had plead facts supporting deliberate indifference especially as Nueces County, Texas has been aware of prior constitutional violations based upon the *Carrillo, Green* and *Cheek* cases cited above.

166. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

167. Plaintiff has plead facts to support that Defendant, Nueces County, Texas was deliberately indifferent because it disregarded known or obvious consequence of its actions and actually changed its policy regarding the housing of mentally ill inmates and adopted

a new policy approximately 9 months after Mr. Johnson's death.

### 4. Claims against Final Policymaker/Supervisor, Defendant Sheriff Hooper[20]

168. Plaintiff brings a claim against Defendant Sheriff Hooper, in his individual capacity, for his own conduct which denied Plaintiff his constitutional rights. In this case, Plaintiff contends that Defendant Sheriff Hooper, in his individual capacity, violated his constitutional rights by implementing unconstitutional policies that caused the constitutional violations; by failing to train and/or supervise the subordinates, Defendants Zapata, Fielder and Culp, involved in the violation of Plaintiff's rights.

169. Defendant Sheriff Hooper, acted with deliberate indifference, because he was: (1) aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and (2) did actually draw that inference. Deliberate indifference requires a showing of more than negligence or even gross negligence.

170. Defendant Sheriff Hooper also failed to adopt policies when he knew that a failure to adopt a policy was deliberately indifferent when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights related to excessive force under the Fourteenth Amendment to the United States Constitution. This is especially true in light of the *Carrillo, Green* and *Cheek* cases.

171. A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional

---

[20] Fifth Circuit Pattern Jury Instructions 10.4

rights.

172. To satisfy the deliberate indifference prong of a failure-to-train claim, Plaintiff must prove that Defendant Sheriff Hooper knew or should have known that a particular omission in the training program would cause employees to violate the constitutional rights of inmates that they encounter, but Defendant Sheriff Hooper, nevertheless chose to retain that program. To prove deliberate indifference in this way, Plaintiff must show a pattern of similar constitutional violations by improperly trained employees as has been specifically plead in this case.

173. In this case, Plaintiff contends that Defendant Sheriff Hooper violated his constitutional rights by implementing unconstitutional policies that are set-out in detail in this complaint; failing to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights which are incorporated by reference causing the constitutional violation; and failure to train and supervise Defendants Zapata, Culp and Fielder which caused the constitutional violations suffered by Mr. Johnson.

174. To prevail in Plaintiff's claim against Defendant, Sheriff Hooper, in his individual capacity, Plaintiff has plead facts that support:

a. Defendants Zapata, Fielder and Culp, all under Defendant Sheriff Hooper's supervision, violated Plaintiff's constitutional rights;

b. Defendant Sheriff Hooper's implemented unconstitutional policies; failed to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights, excessive force; failed to train (to which Defendant Sheriff Hooper admitted during an

interview); and failed to supervise Defendants Zapata, Culp and Fielder.

c. The implementation of unconstitutional policies; failure to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights, excessive force; failed to train (to which Defendant Sheriff Hooper admitted during an interview); and failed to supervise Defendants Zapata, Culp and Fielder caused the violation of the Plaintiff's rights; and

d. Defendant, Nueces County Sheriff Hooper's acted and failed to act with deliberate indifference.

## 5. Damages

### a. Survival

175. As a direct and proximate result of Defendants' violations, and each of them, Mr. Johnson suffered severe and permanent injuries and damages, severe shock, extreme and excruciating physical pain and mental suffering, including fear of impending death, conscious pre-death fear and apprehension of impending death, loss of enjoyment of life, aggravation, inconvenience, humiliation, shame, shock, funeral and burial expenses and loss of income and earnings up and until the time of his death.

### b. Wrongful Death

176. As a direct and proximate result of Defendants' violations, and each of them, Mr. Longoria has been deprived of the services, comfort of his society and companionship as well as other pleasures and rights that have pecuniary value, which attend to immediate family relationships.

### c. Punitive and/or Exemplary Damages

177. The actions and omissions of Individuals Defendants: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity; Individual Defendant Policymaker and Supervisor: John Chris Hooper, Nueces County Sheriff, in his individual capacity; Defendant Municipality: Nueces County, Texas identified herein were unlawful, unconstitutional, shocking to the conscience, and were performed maliciously, recklessly, fraudulently, sadistically, intentionally, willfully, wantonly and in complete and utter disregard of Mr. Johnson's constitutional rights and privileges guaranteed to Mr. Johnson pursuant to 42 U.S.C. §1983. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages in an amount appropriate to punish and make an example of Defendants and deter Defendants and others from like conduct in the future.

### B. 42 U.S.C. §1983 - Fourteenth Amendment - Bodily Integrity[21]

### 1. Background

178. Plaintiff incorporates by reference the allegations set-out in paragraphs 1 - 75 of this Complaint as if fully set-out herein.

---

[21] "[t]he existence of this right to ultimate bodily security... is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process. Numerous cases in a variety of contexts recognize it as a last line of defense against those literally outrageous abuses of official power...." *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980). For example, in a case involving rape by a police officer after a traffic stop, the Eighth Circuit emphasized that the officer's sexual assault "was a violation of the most intimate kind of bodily integrity," and concluded that the district court did not err in concluding that the officer's "egregious sexual violation" deprived the victim of a due process right. *Rogers v. City of Little Rock,* 152 F.3d 790, 796 (8th Cir.1998). In a case with nearly identical facts, the Fourth Circuit described the due process right at issue as a "right ... not to be subjected by anyone acting under color of state law to the wanton infliction of physical harm." *Jones v. Wellham,* 104 F.3d 620, 628 (4th Cir.1997). 796 (8th Cir.1998).

179. Plaintiff pleads this claim in the alternative as allowed under FRCP 8 to the extent the facts of this claim and his other claims in this lawsuit are inconsistent.

180. Plaintiff brings claims for violations of his rights under 42 U.S.C. §1983 and the Fourteenth Amendment – Bodily Integrity against the following Defendants:

> Employees of Nueces County, Texas who are individual defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity

> Individual Defendant Policymaker and Supervisor who is an individual defendant acting under color of state law for purposes of 42 U.S.C. § 1983: John Chris Hooper, Nueces County Sheriff, in his individual capacity

> Defendant Municipality: Nueces County, Texas

181.  Section 1983 of the Civil Rights of 1871, 42 U.S.C. § 1983, prohibits any person acting under color of state law from depriving any citizen or person of the rights, privileges and immunities secured by the Constitution.

182. It was clearly established at the time of the events made the basis of this lawsuit that citizens, such as Mr. Johnson, have the right of substantive due process under the Fourteenth Amendment to "[t]he right to be free of state-occasioned damage to ... bodily integrity" from the acts of those "acting under color of state law."  *Scott v. Moore*, 85 F.3d 230, 235 (5th Cir. 1996) *citing Partridge v. Two Unknown Police Officers of the City of Houston,* 791 F.2d 1182, 1186 (5th Cir.1986). At issue in this case are the assaults and related violations of Mr. Johnson's bodily integrity of photographing intimate areas of his body by force by Defendants Zapata, Fielder and Culp which seriously injured Mr. Johnson

ultimately leading to his death.

## 2. Claims against Individual Defendants Zapata, Fielder and Culp

183. The assaults, actions and force purposely or knowingly used against Mr. Johnson by Defendants Zapata, Fielder, and Culp, individually, were objectively unreasonable and were so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.[22]   These specific acts are set out specifically in paragraphs 32-66 and their actions and inactions were the proximate cause of Mr. Johnson's physical and emotional injuries and death. These Defendants do not have qualified immunity because the law related to bodily integrity under the Fourteenth Amendment was clearly established at the time of the events made the basis of this lawsuit.

184. The actions of Defendants Zapata, Fielder and Culp, individually, are acts under color of state law.

185. Mr. Johnson did nothing to invite or in any other manner give any legal justification for the assaults and violations of his bodily integrity that are raised in this lawsuit. Defendants, Zapata, Fielder, Culp, intentionally assaulted and violated Mr. Johnson's bodily integrity without legal justification.

---

[22] Conduct sufficient to shock the conscience for substantive due process purposes has been described in several different ways. It has been described as conduct that " violates the decencies of civilized conduct" ; conduct that is " so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency" ; conduct that " interferes with rights implicit in the concept of ordered liberty" ; and conduct that " is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."

### 3. Claims against Defendant Nueces County, Texas[23]

186. Plaintiff claims that Defendant Nueces County, Texas violated his substantive due process rights under the Fourteenth Amendment right to be protected from violations of his bodily integrity.

187. The substantive due process clause of the Fourteenth Amendment to the Constitution of the United States protects citizens like Plaintiff from violations of their bodily integrity.

188. A county is not liable for the actions of its employees unless the constitutional violation was caused by a county's policy or custom.

189. Plaintiff has plead detailed facts in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein, which support:

> a. Official policies, longstanding practices and/or customs existed for Nueces County, Texas, which were implemented by the final policymaking officials for Nueces County, Texas who are the Nueces County Commissioners Court and the Nueces County Judge. Official policies, longstanding practices and/or customs existed for the Nueces County, Texas Jail which were implemented by the final policymaking officials for the Nueces County Jail who are former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper.

---

[23] Texas Pattern Jury Charge 10.5

b. policymakers for Nueces County, Texas, specifically, the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, knew or should have known about the policies and/or customs;

c. the policymakers, the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, were deliberately indifferent; and

d. the policies and/or customs were the moving force leading to the constitutional violation being the bodily integrity violation against Mr. Johnson causing him emotional and physical injury and death.

190. Plaintiff has also plead facts that support:

the training or hiring procedures of the municipality's policymaker were inadequate,

the municipality's policymakers were deliberately indifferent in adopting the hiring or training policy, and

the inadequate hiring or training policy directly caused the plaintiff's injury.

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).

191. A "policy" can be a policy statement, ordinance, regulation, or decision officially adopted and promulgated by a final policymaker for Nueces County, Texas which are the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper.

192. A "custom" is a persistent, widespread practice of Nueces County, Texas' officials or employees that, although not formally adopted, is so common and well-settled that it fairly represents Nueces County, Texas' policy. The Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and

Defendant Sheriff Hooper, established the policies, practices and customs for the Nueces County Jail made the basis of this lawsuit which have been specifically plead in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

193. Nueces County, Texas' final policy making officials for the Nueces County Jail, Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, knew or should have known about the customs set-out in the facts portion of this lawsuit in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

194. A local government entity violates §1983 where its official policy or custom serves to deprive an individual of his or her constitutional rights. *Monell*, 436 U.S. at 692-94. A city's custom or policy can be unconstitutional in two ways: 1) facially

unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id*. Where the identified policy is itself facially lawful, the plaintiff "must demonstrate the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) *citing City of Canton*, 489 U.S. at 388. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Brown, 520 U.S. at 410, 117 S.Ct. 1382. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *City of Canton*, 489 U.S. at 383, 388.   In the present case, Mr. Johnson had plead facts supporting deliberate indifference especially as Nueces County, Texas has been aware of prior constitutional violations based upon the *Carrillo, Green* and *Cheek* cases and other events cited above.

195. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

196. Plaintiff has plead facts to support that Defendant, Nueces County, Texas was deliberately indifferent because it disregarded known or obvious consequence of its actions.

### 4. Claims against Policymaker/Supervisor, Defendant Sheriff Hooper[24]

197. Plaintiff brings a claim against Defendant Sheriff Hooper, in his individual capacity, for his own conduct which denied Plaintiff his constitutional rights. In this case, Plaintiff contends that Defendant, Sheriff Hooper, in his individual capacity, violated his constitutional rights by implementing unconstitutional policies that caused the constitutional violations; by failing to train and or supervise the subordinates involved in the violation of Plaintiff's rights.

198. Defendant Sheriff Hooper, acted with deliberate indifference, because he was: (1) aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and (2) did actually draw that inference. Deliberate indifference requires a showing of more than negligence or even gross negligence.

199. Defendant Sheriff Hooper also failed to adopt policies when he knew that a failure to adopt a policy was deliberately indifferent when it is obvious that the likely consequence of not adopting a policy would be a deprivation of constitutional rights related to bodily integrity such as what occurred to Mr. Johnson.

200. To satisfy the deliberate indifference prong of a failure-to-train claim, Plaintiff must prove that Defendant Sheriff Hooper, knew or should have known that a particular omission in the training program would cause employees to violate the constitutional rights of inmates they encounter, but Defendant Sheriff Hooper,

---

[24] Fifth Circuit Pattern Jury Instructions 10.4

nevertheless chose to retain that program. To prove deliberate indifference in this way, Plaintiff must show a pattern of similar constitutional violations by improperly trained employees as has been specifically plead in this case.

201. In this case, Plaintiff contends that Defendant Sheriff Hooper violated his constitutional rights by implementing unconstitutional policies that are set-out in detail in the facts portion of this complaint; failing to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights which are incorporated by reference causing the constitutional violation; and failure to train and supervise Defendants Zapata, Culp and Fielder which caused the constitutional violations suffered by Mr. Johnson.

202. To prevail in Plaintiff's claim against Defendant Sheriff Hooper, in his individual capacity, Plaintiff has plead facts that support:

a. Defendants Zapata, Fielder and Culp, all under Defendant Sheriff Hooper's supervision, violated Plaintiff's constitutional rights;

b. Defendant Sheriff Hooper's implemented unconstitutional policies; failed to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights, violation of bodily integrity; failed to train (to which Defendant Sheriff Hooper admitted during an interview); and failed to supervise Defendants Zapata, Culp and Fielder.

c. The implementation of unconstitutional policies; failure to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights; failed to train (to which Defendant Sheriff Hooper admitted during an interview); and failed to supervise Defendants Zapata, Culp and Fielder caused the violation of the Plaintiff's rights – violation of bodily integrity; and

d. Defendant, Nueces County Sheriff Hooper's acted and failed to act with deliberate indifference.

## 5. Damages

### a. Survival

203. As a direct and proximate result of Defendants' violations, and each of them, Mr. Johnson suffered severe and permanent injuries and damages, severe shock, extreme and excruciating physical pain and mental suffering, including fear of impending death, conscious pre-death fear and apprehension of impending death, loss of enjoyment of life, aggravation, inconvenience, humiliation, shame, shock, funeral and burial expenses and loss of income and earnings up and until the time of his death.

### b. Wrongful Death

204. As a direct and proximate result of Defendants' violations, and each of them, Mr. Longoria has been deprived of the services, comfort of his society and companionship as well as other pleasures and rights that have pecuniary value, which attend to immediate family relationships.

### c. Punitive and/or Exemplary Damages

205. The actions and omissions of Individuals Defendants: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity; Individual Defendant Policymaker and Supervisor: John Chris Hooper, Nueces County Sheriff, in his individual capacity; Defendant Municipality: Nueces County, Texas identified herein were unlawful, unconstitutional, shocking to the

conscience, and were performed maliciously, recklessly, fraudulently, sadistically, intentionally, willfully, wantonly and in complete and utter disregard of Mr. Johnson's constitutional rights and privileges guaranteed to Mr. Johnson pursuant to 42 U.S.C. §1983. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages in an amount appropriate to punish and make an example of Defendants and deter Defendants and others from like conduct in the future.

### C. 42 U.S.C. §1983 - Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement — Pretrial Detainee)[25]

### 1. Background

206. Plaintiff incorporates by reference the allegations set-out in paragraphs 1-75 of this Complaint as if fully set-out herein.

207. Plaintiff pleads this claim in the alternative as allowed under FRCP 8 to the extent the facts of this claim and his other claims in this lawsuit are inconsistent.

208. Plaintiff brings claims for violations of his rights under 42 U.S.C. §1983 and the Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement — Pretrial Detainee) against the following Defendants:

> Employees of Nueces County, Texas who are individual defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity

> Individual Defendant Policymaker and Supervisor who is an individual acting under color of state law for purposes of 42 U.S.C. § 1983: John Chris Hooper, Nueces County Sheriff, in his individual capacity

---

[25] Fifth Circuit Pattern Jury Instructions 10.10.

Municipality: Nueces County, Texas

Person acting under color of state law for purposes of 42 U.S.C. § 1983: Wellpath LLC

Employees of Wellpath who are individuals defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Tera Peeler, in her individual capacity, Edra Bocanegra, in her individual capacity, Randee Roberson, in her individual capacity, and Stacey Dawn Flint, in her individual capacity

209.   Section 1983 of the Civil Rights of 1871, 42 U.S.C. § 1983, prohibits any person acting under color of state law from depriving any citizen or person of the rights, privileges and immunities secured by the Constitution.

210. Plaintiff claims that Defendants violated his Fourteenth Amendment right to adequate medical care while he was detained at the Nueces County Jail based upon inadequate medical care or conditions of confinement.

211. A pretrial detainee who has not been convicted of a crime has a right under the Fourteenth Amendment to the United States Constitution to be protected from impermissible punishment like the denial of or delay in providing certain medical care.[26] As a pretrial detainee, Mr. Johnson had a clearly established Fourteenth Amendment right not to be denied, by deliberate indifference, attention to his serious medical needs. *Hare v.*

---

[26] Inadequate medical care claims fall into two categories of "episodic acts or omissions" and "conditions of confinement." *Hare v. City of Corinth, Mississippi*, 74 F.3d 633, 644-50 (5th Cir. 1996) (en banc) and *Shepherd v. Dallas* County, 591 F.3d 445, 452–55 (5th Cir. 2009). An "episodic" claim is one that focuses on one individual's misconduct and requires proof of that individual's specific intent— that one or more state actors acted or failed to act with deliberate indifference to the defendant's needs. Hare, 74 F.3d at 648. In contrast, the "conditions" claim focuses on a policy that is so unreasonable as to demonstrate deliberate indifference in its development and which causes unconstitutional treatment of the defendant. Id. at 645; Shepherd, 591 F.3d at 452 (citing Bell v. Wolfish, 441 U.S. 520, 539 (1979)).

*City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc).

### 2. Claims against Individual Defendants Zapata, Fielder and Culp

212. The assaults, actions and force purposely or knowingly used against Mr. Johnson by Defendants Zapata, Fielder, and Culp, individually, were objectively unreasonable as set out specifically in paragraphs 32-66 and their actions and inactions were the proximate cause of Mr. Johnson's injuries and death. Defendants Zapata, Fielder, and Culp are individually liable to Plaintiff for their failure to provide adequate medical care for the injuries that they caused Mr. Johnson.   These Defendants do not have qualified immunity because the law related to inadequate medical care under the Fourteenth Amendment was clearly established at the time of the events made the basis of this lawsuit.

213. The actions of Defendants Zapata, Fielder and Culp, individually, are acts under color of state law.

214. Mr. Johnson did nothing to invite or in any other manner give any legal justification for the failure to provide adequate medical care by Defendants, Zapata, Fielder and Culp. In fact, he repeatedly tried to get help and yelled, "Help me."

### 3. Claims against Defendant Nueces County, Texas[27]

215. Plaintiff claims that Defendant Nueces County, Texas violated his rights under 42 U.S.C. §1983 and the Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement — Pretrial Detainee) which protects pretrial detainees like

---

[27] Fifth Circuit Pattern Jury Charge 10.5

Plaintiff from punishment, including the denial of adequate medical care.

216. A county is not liable for the actions of its employees unless the constitutional violation was caused by a county's policy or custom.

217. To support this alleged constitutional violation, Plaintiff has plead the following facts specifically in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein which support:

> 1. the existence of an identifiable or intended condition, policy, or practice of inadequate medical care; and

> 2. that the condition, policy, or practice was not reasonably related to a legitimate governmental objective.

218. As to the first element, a condition usually results from an explicit policy or restriction. But a pattern may demonstrate an unstated or *de facto* policy. To show such a policy, Plaintiff must show more than isolated instances of inadequate or even negligent medical care. It is likewise not enough to show that Plaintiff suffered from episodic acts or omissions of jail officials. Instead, Plaintiff must show that the disputed acts are indicative of a system-wide problem that has been extended or pervasive. In other words, if Plaintiff relies on an act or omission of a particular jail officer to prove his claim, the act or omission must be the result of an established policy, or it must be part of, or typical of, an extended

or pervasive practice to prove that Defendant Nueces County, Texas intended the condition or practice. Defendant Nueces County, Texas clearly knew of the policies, practices and customs as evidenced by the *Carrillo, Green* and *Cheek* cases. As well, Nueces County, Texas changed its policy regarding the housing of mentally ill inmates approximately 9 months after Mr. Johnson's death.

219. To establish the second element, Plaintiff must prove that the condition constituted impermissible punishment to show that it was not reasonably related to a legitimate governmental objective. Not every denial or delay of medical care imposed during pretrial detention amounts to "punishment" in the constitutional sense. The effective management of a detention facility is a valid objective that may justify imposing conditions and restrictions. Pretrial detainees are not entitled to the best medical care available or to the level of medical care that may be available to persons who are not detained or incarcerated. But a facility must provide for a detainee's basic human needs. Clearly, Mr. Johnson's basic human needs were not met when he cried for help and was denied adequate medical care to address his injuries which resulted in his death.

220. To satisfy this element, Plaintiff must prove that the level of medical care provided generally at the Nueces County Jail was so inadequate that it resulted in a serious deprivation of his basic human needs, and that the level of care provided was not reasonably related to a legitimate governmental objective. Simply returning Mr. Johnson to his cell, unmonitored, was clearly not adequate medical care and denied him basic human needs. Mr. Johnson never saw a physician nor a psychiatrist. Plead alternatively, under FRCP 8,

if Mr. Johnson had bronchopneumonia, bilateral, he had no treatment for this condition leading to his death which is a denial of basic human needs. There was no legitimate government interest in denying Mr. Johnson adequate medical care.

221. Plaintiff has plead detailed facts in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein which support:

    a. Official policies, longstanding practices and/or customs existed for Nueces County, Texas, which were implemented by the final policymaking officials for Nueces County, Texas who are the Nueces County Commissioners Court and the Nueces County Judge. Official policies, longstanding practices and/or customs existed for the Nueces County, Texas Jail which were implemented by the final policymaking officials for the Nueces County Jail who are former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper.

    b. policymakers for Nueces County, Texas, specifically, the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, knew or should have known about the policies and/or customs;

    c. the policymakers, Nueces County, Texas, specifically, the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, were deliberately indifferent; and

    d. the policies and/or customs were the moving force leading to the constitutional violation being the failure to provide adequate medical care for Mr. Johnson causing him injury and death.

222. Plaintiff has also plead facts that support:

the training and hiring procedures of the municipality's policymaker were inadequate,

the municipality's policymakers were deliberately indifferent in adopting the hiring or training policy, and

the inadequate hiring or training policy directly caused the plaintiff's injury."

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).

223. A "policy" can be a policy statement, ordinance, regulation, or decision officially adopted and promulgated by Nueces County's officers, in this case, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper.

224. A "custom" is a persistent, widespread practice of Nueces County, Texas' officials or employees that, although not formally adopted, is so common and well-settled that it fairly represents Nueces County, Texas' policy. Former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, established the customs for the Nueces County Jail made the basis of this lawsuit which have been specifically plead 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

225. Nueces County, Texas' final policymaking officials for the Nueces County

Jail, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper knew or should have known about the customs set-out in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

226. A local government entity violates §1983 where its official policy or custom serves to deprive an individual of his or her constitutional rights. *Monell*, 436 U.S. at 692-

227. A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id*. Where the identified policy is itself facially lawful, the plaintiff "must demonstrate the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) *citing City of Canton*, 489 U.S. at 388. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Brown, 520 U.S. at 410, 117 S.Ct. 1382. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." City of Canton, 489 U.S. at 383, 388.

228. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

229. Plaintiff has plead facts to support that Defendant, Nueces County, Texas was deliberately indifferent because it disregarded known or obvious consequence of its actions plead in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein. Defendant Nueces County, Texas clearly knew of the policies, practices and customs as evidenced by the *Carrillo, Green* and *Cheek* cases. As well, Nueces County, Texas changed its policy regarding the housing of mentally ill inmates approximately 9 months after Mr. Johnson's death.

### 4. Claims against Policymaker/Supervisor Defendant Sheriff Hooper[28]

230. Plaintiff brings a claim against Defendant Sheriff Hooper, in his individual capacity, for his own conduct which denied Plaintiff his constitutional rights. In this case, Plaintiff contends that Defendant, Sheriff Hooper, in his individual capacity, violated his constitutional rights by implementing unconstitutional policies

---

[28] Fifth Circuit Pattern Jury Instructions 10.4

that caused the constitutional violations; by failing to train and or supervise the subordinates involved in the violation of Plaintiff's rights.

231. Defendant Sheriff Hooper, acted with deliberate indifference, because he was: (1) aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and (2) did actually draw that inference. Deliberate indifference requires a showing of more than negligence or even gross negligence.

232. Defendant Sheriff Hooper also failed to adopt policies when he knew that a failure to adopt a policy was deliberately indifferent when it is obvious that the likely consequence of not adopting a policy would be a deprivation of constitutional rights related to inadequate medical care such as what occurred to Mr. Johnson.

233. To satisfy the deliberate indifference prong of a failure-to-train claim, Plaintiff must prove that Defendant Sheriff Hooper, knew or should have known that a particular omission in the training program would cause employees to violate the constitutional rights of inmates they encounter, but Defendant Sheriff Hooper, nevertheless chose to retain that program. To prove deliberate indifference in this way, Plaintiff must show a pattern of similar constitutional violations by improperly trained employees as has been specifically plead.

234. In this case, Plaintiff contends that Defendant Sheriff Hooper violated his constitutional rights by implementing unconstitutional policies that are set-out in detail in the facts portion of this complaint; failing to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights

which are incorporated by reference causing the constitutional violation; and failure to train and supervise Defendants Zapata, Culp and Fielder which caused the constitutional violations suffered by Mr. Johnson.

235. To prevail in Plaintiff's claim against Defendant Sheriff Hooper, in his individual capacity, Plaintiff has plead facts that support:

a. Defendants Zapata, Fielder and Culp, who were under Defendant Sheriff Hooper's supervision violated Plaintiff's constitutional rights to adequate medical care for inmates;

b. Defendant Sheriff Hooper implemented unconstitutional policies related to inadequate medical care; failed to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights related to adequate medical care for inmates; failed to train related to adequate medical care for inmates; and failed to supervise Defendants Zapata, Culp and Fielder related to adequate medical care for inmates.

c. The implementation of unconstitutional policies; failure to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights; failed to train; and failed to supervise Defendants Zapata, Culp and Fielder caused the violation of the Plaintiff's rights to inadequate medical care; and

d. Defendant, Nueces County Sheriff Hooper's acted and failed to act with deliberate indifference.

### 5. Claims Against WellPath LLC acting as a person under color of state law for purposes of 42 U.S.C. § 1983: Wellpath LLC

236. Plaintiff claims that Wellpath LLC violated his rights under 42 U.S.C. §1983 and the Fourteenth Amendment (Inadequate Medical Care or Conditions of Confinement — Pretrial Detainee) which protects pretrial detainees like Plaintiff from punishment, including the denial of adequate medical care.

237. Wellpath may be considered as a person acting under color of state law for purposes of § 1983 because it is a private entity performing a state function.   For Wellpath to be liable under § 1983, Plaintiff must allege facts showing a policy or a custom of Wellpath that caused his injury. *See Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691–94 (1978) (stating requirements for pursuing a § 1983 claim against a municipality); *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) (extending *Monell* requirements to a private entity performing a state function); *Wabuyabo v. Correct Care Sols.*, 723 F. App'x 642, 643 (10th Cir. 2018) ("[T]o state a claim against CCS, [Plaintiff] must identify an official policy or custom that led to the alleged constitutional violation.").

238. To support this alleged constitutional violation, Plaintiff has plead the following facts specifically in paragraphs 1-75 (background facts), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein which support:

1. the existence of an identifiable or intended condition, policy, or practice of inadequate medical care; and

2. that the condition, policy, or practice was not reasonably related to a legitimate governmental objective.

239. The Health Services Agreement that was entered into by Defendant Nueces County, Texas and Wellpath clearly made a deliberate choice and knew that the policies, practices and customs do not provide for adequate medical care for Nueces County

inmates.

240. The level of medical care provided by Wellcare generally at the Nueces County Jail was so inadequate that it resulted in a serious deprivation of his basic human needs, and that the level of care provided was not reasonably related to a legitimate governmental objective. Simply returning Mr. Johnson to his cell, unmonitored, was clearly not adequate medical care and denied him basic human needs. Mr. Johnson never saw a physician nor a psychiatrist. There was no legitimate government interest in denying Mr. Johnson adequate medical care.

241. Plaintiff has plead detailed facts in paragraphs 1-75 (background facts), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein which support:

a. Official policies, longstanding practices and/or customs existed for Wellpath in relation to the Nueces County Jail which were implemented by the final policymaking officials for Wellpath who entered into the Health Services Agreement with Nueces County, Texas. Official policies, longstanding practices and/or customs existed for the Wellpath which were implemented by the final policymaking officials for Wellpath.

b. policymakers for Wellpath knew or should have known about the policies and/or customs;

c. the policymakers for Wellpath were deliberately indifferent; and

d. the policies and/or customs were the moving force leading to the constitutional violation being the failure to provide adequate medical care for Mr. Johnson causing him injury and death.

242. A "custom" is a persistent, widespread practice of Wellpath's officials or employees that, although not formally adopted, is so common and well-settled that it fairly represents Wellpath's policy.

243. Wellpath's final policymaking officials knew or should have known about the customs set-out in paragraphs 1-75 (background facts), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

244. Wellpath acted with deliberate indifference, as the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

245. Plaintiff has plead facts to support that Defendant Wellpath was deliberately indifferent because it disregarded known or obvious consequence of its actions plead in paragraphs 1-75 (background facts), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein. Defendant Wellpath clearly knew of the policies as evidenced by the Health Services Agreement.

### 6. Claims Against Employees of Wellpath who are individual defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Tera Peeler, in her individual capacity, Edra Bocanegra, in her individual capacity, Randee Roberson, in her individual capacity, and Stacey Dawn Flint, in her individual capacity

246. Defendants Peeler, Bocanegra, Roberson and Flint are individually liable to Plaintiff for their failure to provide adequate medical care for Mr. Johnson's injuries caused by the assaults by Defendants Zapata, Fielder and Culp. Pursuant to FRCP 8, pleaded alternatively, Defendants Peeler, Bocanegra, Roberson and Flint are individually liable to Plaintiff for their failure to provide adequate medical care for Mr. Johnson's acute bronchopneumonia, bilateral. These Defendants do not have qualified immunity because the law related to inadequate medical care under the Fourteenth Amendment was clearly established at the time of the events made the basis of this lawsuit.

247. The actions of Defendants Peeler, Bocanegra, Roberson and Flint, individually, are acts under color of state law.

248. Mr. Johnson did nothing to invite or in any other manner give any legal justification for the failure to provide adequate medical care by Defendants, Peeler, Bocanegra, Roberson and Flint. In fact, he repeatedly tried to get help and yelled, "Help me."

### 5. Damages

### a. Survival

249. As a direct and proximate result of Defendants' violations, and each of them, Mr. Johnson suffered severe and permanent injuries and damages, severe shock, extreme

and excruciating physical pain and mental suffering, including fear of impending death, conscious pre-death fear and apprehension of impending death, loss of enjoyment of life, aggravation, inconvenience, humiliation, shame, shock, funeral and burial expenses and loss of income and earnings up and until the time of his death.

### b. Wrongful Death

250. As a direct and proximate result of Defendants' violations, and each of them, Mr. Longoria has been deprived of the services, comfort of his society and companionship as well as other pleasures and rights that have pecuniary value, which attend to immediate family relationships.

### c. Punitive and/or Exemplary Damages

251. The actions and omissions of Individuals Defendants: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity; Individual Defendant Policymaker and Supervisor: John Chris Hooper, Nueces County Sheriff, in his individual capacity; Defendant Municipality: Nueces County, Texas; Defendant Wellpath, LLC and Defendants: Tera Peeler, in her individual capacity; Edra Bocanegra, in her individual capacity; Randee Roberson, in her individual capacity; and Stacey Dawn Flint, in her individual capacity identified herein were unlawful, unconstitutional, shocking to the conscience, and were performed maliciously, recklessly, fraudulently, sadistically, intentionally, willfully, wantonly and in complete and utter disregard of Mr. Johnson's constitutional rights and privileges guaranteed to Mr. Johnson pursuant to 42 U.S.C. §1983.  Defendants' outrageous and

unconscionable conduct warrants an award of exemplary and punitive damages in an amount appropriate to punish and make an example of Defendants and deter Defendants and others from like conduct in the future.

### D. 42 U.S.C. §1983 - Fourteenth Amendment (Medical Care —Pretrial Detainee/Episodic Acts)[29]

### 1. Background

252. Plaintiff incorporates by reference the allegations set-out in paragraphs 1-75 of this Complaint as if fully set-out herein.

253. Plaintiff pleads this claim in the alternative as allowed under FRCP 8 to the extent the facts of this claim and his other claims in this lawsuit are inconsistent.

254. Plaintiff brings claims for violations of his rights under 42 U.S.C. §1983 and the Fourteenth Amendment (Medical Care — Pretrial Detainee/Episodic Acts) against the following Defendants:

Employees of Nueces County, Texas who are individual defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity

Individual Defendant Policymaker and Supervisor who is an individual defendant acting under color of state law for purposes of 42 U.S.C. § 1983: John Chris Hooper, Nueces County Sheriff, in his individual capacity

Municipality: Nueces County, Texas

Person acting under color of state law for purposes of 42 U.S.C. § 1983: Wellpath, LLC

---

[29] Fifth Circuit Pattern Jury Instructions 10.11

Employees of Wellpath who are individual defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Tera Peeler, in her individual capacity, Edra Bocanegra, in her individual capacity, Randee Roberson, in her individual capacity, and Stacey Dawn Flint, in her individual capacity

255.   Section 1983 of the Civil Rights of 1871, 42 U.S.C. § 1983, prohibits any person acting under color of state law from depriving any citizen or person of the rights, privileges and immunities secured by the Constitution.

256. Plaintiff claims that Defendants violated his Fourteenth Amendment right to adequate medical care while he was detained at the Nueces County Jail based upon episodic acts.[30]

257. A pretrial detainee who has not been convicted of a crime has a right under the Fourteenth Amendment to the United States Constitution to be protected from impermissible punishment like the denial of or delay in providing certain medical care and this right was clearly established at the time of the events made the basis of this lawsuit.[31]

### 2. Claims against the Individual Defendants Zapata, Fielder and Culp

258. Defendants Zapata, Fielder, and Culp are individually liable to Plaintiff for their failure to provide adequate medical care for the injuries that they caused Mr. Johnson. These Defendants do not have qualified immunity because the law related to the rights of pre-trial detainees be protected from impermissible punishment like the denial of or delay in providing certain medical care under the Fourteenth Amendment was clearly established at the time of the events made the basis of this lawsuit.

---

[30] *See* Footnote 26.
[31] *See* Footnote 26.

259. The actions of Defendants Zapata, Fielder and Culp, individually, are acts under color of state law.

260. Mr. Johnson did nothing to invite or in any other manner give any legal justification for the failure to be protected from impermissible punishment like the denial of or delay in providing certain medical care by Defendants, Zapata, Fielder and Culp. In fact, he repeatedly tried to get help and yelled, "Help me."

261. As specifically supported by facts plead in this complaint in paragraphs 1-75

1. Plaintiff was exposed to a substantial risk of serious harm;

2. Defendants, Zapata, Fielder and Culp, displayed deliberate indifference to that risk; and

3. the deliberate indifference harmed the Plaintiff.

### 3. Claims against Defendant Nueces County, Texas[32]

262. Plaintiff claims that Defendant Nueces County, Texas violated his rights under 42 U.S.C. §1983 and the Fourteenth Amendment (Medical Care — Pretrial Detainee/Episodic Acts) which protects pretrial detainees like Plaintiff from punishment, including the right to be protected from impermissible punishment like the denial of or delay in providing certain medical care.

263. A county is not liable for the actions of its employees unless the constitutional violation was caused by a county's policy or custom.

264. To support this alleged constitutional violation, Plaintiff has plead the

---

[32] Fifth Circuit Pattern Jury Instructions 10.5

following facts specifically in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein which support:

     1. Plaintiff was exposed to a substantial risk of serious harm;

     2. Defendant, Nueces County, Texas, displayed deliberate indifference to that risk; and

     3. the deliberate indifference harmed the Plaintiff.

265. The first element asks whether a reasonable person would view Plaintiff's illness or injury as sufficiently serious based on all of the circumstances that existed. This inquiry asks what a reasonable person would conclude and does not consider Defendant's state of mind.

266. The second element—deliberate indifference— requires proof of egregious conduct. Plaintiff must prove Defendant knew of and disregarded an excessive risk to Plaintiff's health or safety.

267. Plaintiff must prove that Defendant:

     (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; and

     (2) actually drew that inference. An inmate's disagreement with the type, amount, or timing of medical treatment he receives is not enough to meet this test.

268. Plaintiff has plead detailed facts in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein which support:

a. Official policies, longstanding practices and/or customs existed for Nueces County, Texas, which were implemented by the final policymaking officials for Nueces County, Texas who are the Nueces County Commissioners Court and the Nueces County Judge. Official policies, longstanding practices and/or customs existed for the Nueces County, Texas Jail which were implemented by the final policymaking officials for the Nueces County Jail who are former Nueces County Sheriff Jim Kaelin and Defendant Sheriff Hooper.

b. policymakers for Nueces County, Texas, specifically, the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, knew or should have known about the policies and/or customs;

c. the policymakers, Nueces County, Texas, specifically, the Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, were deliberately indifferent; and

d. the policies and/or customs were the moving force leading to the constitutional violation being the failure to protect inmates from impermissible punishment like the denial of or delay in providing certain medical care to Mr. Johnson causing him injury and death.

269. A "policy" can be a policy statement, ordinance, regulation, or decision officially adopted and promulgated by Nueces County's officers, in this case, the Nueces

County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper.

270. A "custom" is a persistent, widespread practice of Nueces County, Texas' officials or employees that, although not formally adopted, is so common and well-settled that it fairly represents Nueces County, Texas' policy. The Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, established the customs for the Nueces County Jail made the basis of this lawsuit which have been specifically plead in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

271. Nueces County, Texas' final policymaking officials for the Nueces County Jail, The Nueces County Commissioners Court, Nueces County Judge, former Nueces County Sheriff Kaelin and Defendant Sheriff Hooper, knew or should have known about the customs set-out in the facts portion of this lawsuit in paragraphs 1-75 (background facts), paragraphs 76-100 (relevant to staff shortages), paragraphs 116-121 (relevant to housing mentally ill inmates with the inmates who are not mentally ill), paragraphs 122-143 (relevant to inadequate mental health and medical care) and

paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

272. A local government entity violates §1983 where its official policy or custom serves to deprive an individual of his or her constitutional rights. *Monell*, 436 U.S. at 692-

273. A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id*. Where the identified policy is itself facially lawful, the plaintiff "must demonstrate the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) *citing City of Canton*, 489 U.S. at 388. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Brown, 520 U.S. at 410, 117 S.Ct. 1382. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." City of Canton, 489 U.S. at 383, 388.

274. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

275. In the present case, Mr. Johnson had plead facts supporting deliberate indifference especially as Nueces County, Texas has been aware of prior constitutional

violations based upon the *Carrillo, Green* and *Cheek* cases and other examples cited above. Plaintiff has plead facts to support that Defendant, Nueces County, Texas was deliberately indifferent because it disregarded known or obvious consequence of its actions.

### 4. Claims against Policymaker/Supervisor, Defendant Sheriff Hooper[33]

276. Plaintiff brings a claim against Defendant Sheriff Hooper, in his individual capacity, for his own conduct which denied Plaintiff his constitutional rights. In this case, Plaintiff contends that Defendant, Sheriff Hooper, in his individual capacity, violated his constitutional rights by implementing unconstitutional policies that caused the constitutional violations; by failing to train and or supervise the subordinates involved in the violation of Plaintiff's rights.

277. Defendant Sheriff Hooper, acted with deliberate indifference, because he was: (1) aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and (2) did actually draw that inference. Deliberate indifference requires a showing of more than negligence or even gross negligence.

278. Defendant Sheriff Hooper also failed to adopt policies when he knew that a failure to adopt a policy was deliberately indifferent when it is obvious that the likely consequence of not adopting a policy would be a deprivation of constitutional rights related to inadequate medical care such as what occurred to Mr. Johnson.

279. To satisfy the deliberate indifference prong of a failure-to-train claim,

---

[33] Fifth Circuit Pattern Jury Instructions 10.4

Plaintiff must prove that Defendant Sheriff Hooper, knew or should have known that a particular omission in the training program would cause employees to violate the constitutional rights of inmates they encounter, but Defendant Sheriff Hooper, nevertheless chose to retain that program. To prove deliberate indifference in this way, Plaintiff must show a pattern of similar constitutional violations by improperly trained employees as has been specifically plead.

280. In this case, Plaintiff contends that Defendant Sheriff Hooper violated his constitutional rights by implementing unconstitutional policies that are set-out in detail in the facts portion of this complaint; failing to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights which are incorporated by reference causing the constitutional violation; and failure to train and supervise Defendants Zapata, Culp and Fielder which caused the constitutional violations suffered by Mr. Johnson.

281. To prevail in Plaintiff's claim against Defendant Sheriff Hooper, in his individual capacity, Plaintiff has plead facts that support:

a. Defendants Zapata, Fielder and Culp, who were under Defendant Sheriff Hooper's supervision violated Plaintiff's constitutional rights to adequate medical care for inmates;

b. Defendant Sheriff Hooper implemented unconstitutional policies related to inadequate medical care; failed to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights related to adequate medical care for inmates; failed to train related to adequate medical care for inmates; and failed to supervise Defendants Zapata, Culp and Fielder related to adequate medical care for inmates.

c. The implementation of unconstitutional policies; failure to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights; failed to train; and failed to supervise Defendants Zapata, Culp and Fielder caused the violation of the Plaintiff's rights to inadequate medical care; and

d. Defendant, Nueces County Sheriff Hooper's acted and failed to act with deliberate indifference.

### 5. Person acting under color of state law for purposes of 42 U.S.C. § 1983: Wellpath, LLC

282. Plaintiff claims that Defendant Wellpath violated his rights under 42 U.S.C. §1983 and the Fourteenth Amendment (Medical Care — Pretrial Detainee/Episodic Acts) which protects pretrial detainees like Plaintiff from punishment, including the right to be protected from impermissible punishment like the denial of or delay in providing certain medical care.

283. Wellpath may be considered as a person acting under color of state law for purposes of § 1983 because it is a private entity performing a state function.   For Wellpath to be liable under § 1983, Plaintiff must allege facts showing a policy or a custom of Wellpath that caused his injury. *See Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691–94 (1978) (stating requirements for pursuing a § 1983 claim against a municipality); *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) (extending *Monell* requirements to a private entity performing a state function); *Wabuyabo v. Correct Care Sols.*, 723 F. App'x 642, 643 (10th Cir. 2018) ("[T]o state a claim against

CCS, [Plaintiff] must identify an official policy or custom that led to the alleged constitutional violation.").

284. To support this alleged constitutional violation, Plaintiff has plead the following facts specifically in paragraphs 1-75 (background facts), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein which support:

1. Plaintiff was exposed to a substantial risk of serious harm;

2. Defendant, Nueces County, Texas, displayed deliberate indifference to that risk; and

3. the deliberate indifference harmed the Plaintiff.

285. The first element asks whether a reasonable person would view Plaintiff's illness or injury as sufficiently serious based on all of the circumstances that existed. This inquiry asks what a reasonable person would conclude and does not consider Defendant's state of mind.

286. The second element—deliberate indifference— requires proof of egregious conduct. Plaintiff must prove Defendant knew of and disregarded an excessive risk to Plaintiff's health or safety.

287. Plaintiff must prove that Defendant:

(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; and

(2) actually drew that inference. An inmate's disagreement with the type, amount, or timing of medical treatment he receives is not enough to meet this test.

288. Plaintiff has plead detailed facts in paragraphs 1-75 (background facts), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein which support:

a. Official policies, longstanding practices and/or customs existed for Wellpath in relation to the Nueces County Jail which were implemented by the final policymaking officials for Wellpath who entered into the Health Services Agreement with Nueces County, Texas. Official policies, longstanding practices and/or customs existed for the Wellpath which were implemented by the final policymaking officials for Wellpath.

b. policymakers for Wellpath knew or should have known about the policies and/or customs;

c. the policymakers for Wellpath were deliberately indifferent; and

d. the policies and/or customs were the moving force leading to the constitutional violation being the failure to provide adequate medical care for Mr. Johnson causing him injury and death.

289. A "custom" is a persistent, widespread practice of Wellpath's officials or employees that, although not formally adopted, is so common and well-settled that it fairly represents Wellpath's policy.

290. Wellpath's final policymaking officials knew or should have known about the customs set-out in paragraphs 1-75 (background facts), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not

accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein.

291. Wellpath acted with deliberate indifference, as the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

292. Plaintiff has plead facts to support that Defendant Wellpath was deliberately indifferent because it disregarded known or obvious consequence of its actions plead in paragraphs 1-75 (background facts), paragraphs 122-143 (relevant to inadequate mental health and medical care) and paragraphs 144-147 (relevant to not accurately completing custodial death reports and not cooperating with outside investigations) which are incorporated as if set-out fully herein. Defendant Wellpath clearly knew of the policies as evidenced by the Health Services Agreement.

### 6. Employees of Wellpath who are individual defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Tera Peeler, in her individual capacity, Edra Bocanegra, in her individual capacity, Randee Roberson, in her individual capacity, and Stacey Dawn Flint, in her individual capacity

293. Defendants Peeler, Bocanegra, Roberson and Flint are individually liable to Plaintiff for their failure to provide adequate medical care for the inadequate medical care that they caused Mr. Johnson.   These Defendants do not have qualified immunity because the law related to the rights of pre-trial detainees be protected from impermissible punishment like the denial of or delay in providing certain medical care under the

Fourteenth Amendment was clearly established at the time of the events made the basis of this lawsuit.

294. The actions of Defendants Peeler, Bocanegra, Roberson and Flint, individually, are acts under color of state law.

295. Mr. Johnson did nothing to invite or in any other manner give any legal justification for the failure to be protected from impermissible punishment like the denial of or delay in providing certain medical care by Defendants, Peeler, Bocanegra, Roberson and Flint. In fact, he repeatedly tried to get help and yelled, "Help me."

296. As specifically supported by facts plead in this complaint in paragraphs 1-75

1. Plaintiff was exposed to a substantial risk of serious harm;

2. Defendants, Peeler, Bocanegra, Roberson and Flint, displayed deliberate indifference to that risk; and

3. the deliberate indifference harmed the Plaintiff.

## 5. Damages

### a. Survival

297. As a direct and proximate result of Defendants' violations, and each of them, Mr. Johnson suffered severe and permanent injuries and damages, severe shock, extreme and excruciating physical pain and mental suffering, including fear of impending death, conscious pre-death fear and apprehension of impending death, loss of enjoyment of life, aggravation, inconvenience, humiliation, shame, shock, funeral and burial expenses and loss of income and earnings up and until the time of his death.

### b. Wrongful Death

298. As a direct and proximate result of Defendants' violations, and each of them, Mr. Longoria has been deprived of the services, comfort of his society and companionship as well as other pleasures and rights that have pecuniary value, which attend to immediate family relationships.

### c. Punitive and/or Exemplary Damages

299. The actions and omissions of Individuals Defendants: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity; Individual Defendant Policymaker and Supervisor: John Chris Hooper, Nueces County Sheriff, in his individual capacity; Defendant Municipality: Nueces County, Texas; Defendant Wellpath, LLC and Defendants: Tera Peeler, in her individual capacity; Edra Bocanegra, in her individual capacity; Randee Roberson, in her individual capacity; and Stacey Dawn Flint, in her individual capacity identified herein were unlawful, unconstitutional, shocking to the conscience, and were performed maliciously, recklessly, fraudulently, sadistically, intentionally, willfully, wantonly and in complete and utter disregard of Mr. Johnson's constitutional rights and privileges guaranteed to Mr. Johnson pursuant to 42 U.S.C. §1983.  Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages in an amount appropriate to punish and make an example of Defendants and deter Defendants and others from like conduct in the future.

### E. 42 U.S.C. §1983 - Liability in Connection with the Actions of Another Failure to Intervene/Bystander Liability[34]

### 1. Background

300. Plaintiff incorporates by reference the allegations set-out in paragraphs 1-75 of this Complaint as if fully set-out herein.

301. Plaintiff pleads this claim in the alternative as allowed under FRCP 8 to the extent the facts and law of this claim and his other claims in this lawsuit are inconsistent.

302. Plaintiff brings this claim against Defendants Zapata, Fielder, Culp and Sheriff Hooper.

### 2. Claims against Zapata, Fielder and Culp

303. Bystander liability may be established where an officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.

304. Plaintiff brings claims for violations of his rights under 42 U.S.C. §1983 and the Fourteenth Amendment for failure to intervene in the present against the individual Defendants Zapata, Fielder and Culp as they were each present during the assaults, related violations of Mr. Johnson's bodily integrity, failure to provide adequate medical care and/or contemporaneously aware of the assaults, related violations of Mr. Johnson's bodily integrity, failure to provide adequate medical care and each had a reasonable opportunity to prevent the harm, and yet choose not to act. Each is liable to Plaintiff for failure to

---

[34] Third Court of Appeals, Instructions for Civil Rights Claims Under Section 1983, 4.6.2

intervene/bystander liability for the assaults, related violations of bodily integrity, failure to provide adequate medical care brought in this lawsuit.

305. Section 1983 of the Civil Rights of 1871, 42 U.S.C. § 1983, prohibits any person acting under color of state law from depriving any citizen or person of the rights, privileges and immunities secured by the Constitution.

306. The actions of Defendants Zapata, Fielder and Culp, individually, are acts under color of state law.

307. Mr. Johnson did nothing to invite or in any other manner give any legal justification for the failure of Defendants, Zapata, Fielder and Culp to intervene and stop the constitutional violations. In fact, Mr. Johnson repeatedly tried to get help and yelled, "Help me."

308. Mr. Johnson's constitutional rights were violated as set-out in the facts portion of this complaint 1-75. Specifically: Defendant Zapata and/or Defendant Culp and/or Fielder violated Mr. Johnson's rights under 42 U.S.C. §1983 - Fourteenth Amendment (Excessive Force)— Pretrial Detainees and 42 U.S.C. §1983 - Fourteenth Amendment - Bodily Integrity) by subjecting Mr. Johnson, a pre-trial detainee at the Nueces County Jail, to impermissible punishment by correctional officers Defendants Zapata, Fielder and Culp, namely assault causing serious bodily injury; without his consent, being photographed in the bathroom and/or changing room of the Nueces County Jail; and having his privacy invaded without his consent by having his genitals and/or pubic area and/or anus and/or

buttocks photographed; and having inadequate medical care as a result of the injuries he sustained resulting in Mr. Johnson's death.

309. Defendant Zapata and/or Defendant Culp and/or Defendant Fielder had a duty to intervene to stop the constitutional violations perpetrated against Mr. Johnson by Defendant Zapata and/or Defendant Culp and/or Defendant Fielder.

310. Defendant Zapata and/or Defendant Culp and/or Fielder each had a reasonable opportunity to intervene to stop the constitutional violations perpetrated against Mr. Johnson by Defendant Zapata and/or Defendant Culp and/or Fielder.

311. Defendant Zapata and/or Defendant Culp and/or Fielder violated Mr. Johnson's rights under failed to intervene to stop the constitutional violations perpetrated against Mr. Johnson.

### 3. Claims against Final Policymaker/Supervisor, Defendant Sheriff Hooper[35]

312. Plaintiff brings a claim against Defendant Sheriff Hooper, in his individual capacity, for his own conduct which denied Plaintiff his constitutional rights. In this case, Plaintiff contends that Defendant Sheriff Hooper, in his individual capacity, violated his constitutional rights by implementing unconstitutional policies that caused the constitutional violations; by failing to train and/or supervise the subordinates, Defendants Zapata, Fielder and Culp, involved in the violation of Plaintiff's rights.

313. Defendant Sheriff Hooper, acted with deliberate indifference, because he was:

---

[35] Fifth Circuit Pattern Jury Instructions 10.4

(1) aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and (2) did actually draw that inference. Deliberate indifference requires a showing of more than negligence or even gross negligence.

314. Defendant Sheriff Hooper also failed to adopt policies regarding bystander liability and affirmative requirements to stop violations of inmate's constitutional violations when he knew that a failure to adopt a policy was deliberately indifferent when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights related to excessive force under the Fourteenth Amendment to the United States Constitution. This is especially true in light of the *Carrillo, Green* and *Cheek* cases.

315. A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights.

316. To satisfy the deliberate indifference prong of a failure-to-train claim, Plaintiff must prove that Defendant Sheriff Hooper knew or should have known that a particular omission in the training program would cause employees to violate the constitutional rights of inmates that they encounter, but Defendant Sheriff Hooper, nevertheless chose to retain that program. To prove deliberate indifference in this way, Plaintiff must show a pattern of similar constitutional violations by improperly trained employees as has been specifically plead in this case.

317. In this case, Plaintiff contends that Defendant Sheriff Hooper violated his

constitutional rights by implementing unconstitutional policies that are set-out in detail in this complaint; failing to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights which are incorporated by reference causing the constitutional violation; and failure to train and supervise Defendants Zapata, Culp and Fielder which caused the constitutional violations suffered by Mr. Johnson.

318. To prevail in Plaintiff's claim against Defendant, Sheriff Hooper, in his individual capacity, Plaintiff has plead facts that support:

a. Defendants Zapata, Fielder and Culp, all under Defendant Sheriff Hooper's supervision, violated Plaintiff's constitutional rights;

b. Defendant Sheriff Hooper's implemented unconstitutional policies; failed to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights, excessive force and bodily integrity and failure to intervene/bystander liability; failed to train (to which Defendant Sheriff Hooper admitted during an interview); and failed to supervise Defendants Zapata, Culp and Fielder.

c. The implementation of unconstitutional policies; failure to implement policies when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights, excessive force and bodily integrity and failure to intervene/bystander liability; failed to train (to which Defendant Sheriff Hooper admitted during an interview); and failed to supervise Defendants Zapata, Culp and Fielder caused the violation of the Plaintiff's rights; and

d. Defendant, Nueces County Sheriff Hooper's acted and failed to act with deliberate indifference.

## 4. Damages

### a. Survival

319. As a direct and proximate result of Defendants' violations, and each of them, Mr. Johnson suffered severe and permanent injuries and damages, severe shock, extreme and excruciating physical pain and mental suffering, including fear of impending death, conscious pre-death fear and apprehension of impending death, loss of enjoyment of life, aggravation, inconvenience, humiliation, shame, shock, funeral and burial expenses and loss of income and earnings up and until the time of his death.

### b. Wrongful Death

320. As a direct and proximate result of Defendants' violations, and each of them, Mr. Longoria has been deprived of the services, comfort of his society and companionship as well as other pleasures and rights that have pecuniary value, which attend to immediate family relationships.

### c. Punitive and/or Exemplary Damages

321. The actions and omissions of Individuals Defendants: Javier Zapata, Jr., in his individual capacity, William Fielder, in his individual capacity, Richard Culp, in is individual capacity; Individual Defendant Policymaker and Supervisor: John Chris Hooper, Nueces County Sheriff, in his individual capacity; Defendant Municipality: Nueces County, Texas identified herein were unlawful, unconstitutional, shocking to the conscience, and were performed maliciously, recklessly, fraudulently, sadistically, intentionally, willfully, wantonly and in complete and utter disregard of Mr. Johnson's

constitutional rights and privileges guaranteed to Mr. Johnson pursuant to 42 U.S.C. §1983. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages in an amount appropriate to punish and make an example of Defendants and deter Defendants and others from like conduct in the future.

### F. Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132

322. Plaintiff repeats and realleges the preceding paragraphs, 1-75, as if fully set forth in this Count.

323. Plaintiff pleads this claim in the alternative as allowed under FRCP 8 to the extent the facts and law of this claim and his other claims in this lawsuit are inconsistent.

324. This claim is alleged against Defendant, Nueces County, Texas.

325. Section 12132 of the ADA provides, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" is defined as "(A) any State or local government" or "(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

326. Mr. Johnson had schizoaffective disorder, depressive type and is a qualified person with a disability under the Americans with Disabilities Act, and his disability was known to the Defendant. Mr. Johnson was an individual with a disability within the

meaning of 42 U.S.C. §12131(2). His serious mental illnesses, constitute mental impairments that substantially limit him in several major life activities, including but not limited to learning, concentrating, thinking, and interacting with others. As a result, the Defendant had an obligation to accommodate his disability by housing him in a mental health treatment facility rather than in the Nueces County Jail's general population. The Defendant intentionally failed to accommodate Mr. Johnson's mental health disability, and these failures led to Mr. Johnson's assault, serious bodily injury, death. The Defendant failed to place Mr. Johnson in an appropriate environment to protect him from violent and unlawful acts of third parties against him which were intentionally perpetrated against him by Defendants Zapata, Fielder and Culp because of his mental health disabilities and in discrimination against him because of those disabilities.

327. Defendant Nueces County, Texas is a public entity as that term is used in 42 U.S.C. §12131(1).

328. Mr. Johnson was entitled to be free from discrimination under the Americans with Disabilities Act, 42 U.S.C. §12131 *et seq.* Defendant failed to accommodate Mr. Johnson's mental and medical disabilities and denied him the benefits and services of their facilities by reason of his disabilities by, *inter alia*, failing to place Mr. Johnson in a mental health facility to receive appropriate care, treatment and protection and/or prevent his interaction with untrained and violent correctional officers resulting in an intentional assault, deadly bodily injury, and violations of his bodily integrity by Defendants Zapata,

Fielder and Culp because of Mr. Johnson's mental health disabilities which left him in a vulnerable state and susceptible to violent acts and crimes.

329. Plaintiff seeks all damages available under law, including, but not limited to compensatory damages, attorney's fees and other relief, for the intentional violation of his rights and the discrimination that he suffered in violation of the Americans with Disabilities Act.

## G. Section 1988 – Attorney's Fees.

330.    The preceding allegations in the Facts portion of this pleading are incorporated herein as if each was restated and re-alleged in its entirety.

331. Plaintiff alleges this count against the Defendants, Nueces County, Texas; Javier Zapata, Jr., in his individual capacity; William Fielder, in his individual capacity; Richard Culp, in his individual capacity; John Chris Hooper, Nueces County Sheriff, in his individual capacity; Wellpath LLC, formerly known as Correct Care Solutions, LLC; Tera Peeler, in her individual capacity; Edra Bocanegra, in her individual capacity; Randee Roberson, in her individual capacity; and Stacey Dawn Flint, in her individual capacity.

332. Because the actions of Defendants, Nueces County, Texas; Javier Zapata, Jr., in his individual capacity; William Fielder, in his individual capacity; Richard Culp, in his individual capacity; and John Chris Hooper, Nueces County Sheriff, in his individual capacity, were taken under color of state law to deprive Mr. Johnson of his rights under the Fourteenth Amendment to the United States Constitution and his civil rights under §1983, Plaintiff had to obtain the services of The Bandas Law Firm, P.C. and the Law Office of

Gay E. Gilson to vindicate the violation of his constitutional and civil rights and has therefore incurred attorneys' fees.

333.   Pursuant to 42 U.S.C. §1988, Plaintiff asserts his claim for attorneys' fees against Defendants Nueces County, Texas; Javier Zapata, Jr., in his individual capacity; William Fielder, in his individual capacity; Richard Culp, in his individual capacity; John Chris Hooper, Nueces County Sheriff, in his individual capacity, Wellpath LLC, formerly known as Correct Care Solutions, LLC; Tera Peeler, in her individual capacity; Edra Bocanegra, in her individual capacity; Randee Roberson, in her individual capacity; and Stacey Dawn Flint, in her individual capacity, if he prevails in his claims under §1983.

### Jury Trial Requested

334. Plaintiff requests a trial by jury.

### Prayer

335. WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, jointly and severally, and award Plaintiff the following:

a. Survival damages: As a direct and proximate result of Defendants' violations, and each of them, Mr. Johnson suffered severe and permanent injuries and damages, severe shock, extreme and excruciating physical pain and mental suffering, including fear of impending death, conscious pre-death fear and apprehension of impending death, loss of enjoyment of life, aggravation, inconvenience, humiliation, shame, shock, <u>funeral and burial expenses</u> and loss of income and earnings up and until the time of his death.

b. Wrongful death damages: As a direct and proximate result of Defendants' violations, and each of them, Mr. Longoria has been deprived of the services, comfort of his society and companionship as well as other pleasures and rights that have pecuniary value, which attend to immediate family relationships.

c. Punitive and/or exemplary damages as allowed by law;

d. Prejudgment interest as allowed by law;

e. Post-judgment interest as allowed by law;

f. Plaintiffs are entitled to and seek an award of attorney fees and costs under 42 U.S.C. §1988(b).

g. All relief as allowed under the Americans with Disabilities Act;

h. Attorney's fees as allowed under the Americans with Disabilities Act;

i. Court costs and expenses as allowed by law;

j. Such other legal or equitable relief ultimately justified by the proof of this case.

**Respectfully submitted,**

*/s/ Robert J. Sigler*

By: _____

Robert J. Sigler
Texas State Bar No. 18347750
BANDAS LAW FIRM, P.C.
802 N. Carancahua St., Suite 1400
Corpus Christi, Texas 78401-0353
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
E-mail: rsigler@bandaslawfirm.com
**Attorney for Plaintiff**

**OF COUNSEL**:

Gay Gilson
Law Office of Gay E. Gilson
5525 S. Staples, Suite B3
Corpus Christi, Texas 78411
TEL 361-887-0552
FAX 361-887-0554
Email: gegilson@gilsonlaw.com